## DAYTON AIRPLANE CO. v. UNITED STATES.

Circuit Court of Appeals, Sixth Circuit.
October 4, 1927.

Nos. 4657, 4658.

**1. Estoppel ⬥62(2)—Rules of estoppel and fair dealing held applicable to government's war-time contract.**

Rules of estoppel and fair dealing applying between individuals *held* applicable to contract between war-time contractor and government, acting through Secretary of War and his subordinates exercising an unlimited discretion.

**2. United States ⬥73—Provision of government's war-time cost-plus contract for airplanes, requiring preservation of records for six years, held not to show decision of accounting officer was not final.**

That government's war-time cost-plus contract for airplanes required manufacturer to preserve accounts and records, subject to examination by government, for six years, *held* not to show that decision of accounting officer in settlement of such contract was not intended to be final.

**3. United States ⬥75—Contract in settlement of government's war-time contracts held final, unless impeached for fraud or mistake.**

Government's contract with airplane manufacturer in final settlement of several prior cost-plus contracts, after full performance, *held* final, unless impeached for fraud or mistake.

**4. United States ⬥75—Allowance to war-time airplane manufacturer under cost-plus contracts for depreciation of land and buildings, held not result of fraud or mistake vitiating settlement contract.**

Allowance made to war-time manufacturer of airplanes for government under cost-plus contracts, on account of depreciation of outfit of land and buildings obtained for performance of contracts, *held* not result of fraud or mistake, vitiating contract made by government and manufacturer in settlement of all claims arising under prior contracts.

**5. United States ⬥66—Provision of government's war-time cost-plus contract respecting depreciation charges held not so manifestly unfair as to indicate inadvertence or overreaching.**

Provision in government's war-time cost-plus contract for construction of airplanes, specifically authorizing manufacturer to charge, as part of costs, depreciation of plant arising from inability to sell it after passage of war conditions, *held* not so manifestly unfair to government as to warrant the conclusion that it had been inserted inadvertently or through overreaching of manufacturer.

**6. Evidence ⬥48—Courts judicially know that Director of Aircraft Production must act through authorized representatives.**

Courts may take judicial notice that the Director of Aircraft Production, like Secretary of War himself, must act through his authorized representatives, and that, especially in war time, a contract must contemplate such representation.

21 F.(2d)—43

**7. United States ⬥75—Government's contract in final settlement with war-time airplane manufacturer held valid compromise and settlement, unavoidable by government on theory that certain claims relinquished by manufacturer lacked merit.**

Government's contract with war-time airplane manufacturer, in settlement of prior contracts made after each party had allowed and disallowed certain claims of the other, *held* an accord and satisfaction or compromise and settlement, which could not be avoided by government on ground of an obvious lack of merit in relinquished claims of contractor.

**8. United States ⬥75—Particular items held properly allowed as costs and bonus under government's war-time cost-plus contract for airplanes.**

War-time manufacturer of airplanes under cost-plus contract *held* properly allowed to charge, as part of costs, money paid for services of public accountants, for railroad transportation of employees, and properly allowed to recover a so-called bonus for savings in cost production over estimated or "bogey" price.

**9. United States ⬥66—Provision of government's cost-plus contract for airplanes, allowing manufacturer percentage of savings over estimated cost of production, held not against public policy.**

Provision in government's war-time cost-plus contract for airplanes, allowing manufacturer a bonus consisting of 25 per cent. of money saved through production at less than estimated cost, *held* not against public policy.

Appeals from the District Court of the United States for the Western Division of the Southern District of Ohio; Smith Hickenlooper, Judge.

Action by the United States against the Dayton Airplane Company. Judgment for plaintiff for part only of recovery sought, and defendant appeals, and plaintiff cross-appeals. Remanded, with directions to dismiss.

Alexander Holtzoff, of New York City, and Haveth E. Mau, U. S. Atty., of Cincinnati, Ohio (Herman J. Galloway, Asst. Atty. Gen., and John A. McCann, Sp. Asst. Atty. Gen., on the brief), for the United States.

Judson Harmon, of Cincinnati, Ohio, and F. W. M. Cutcheon, of New York City (John B. Marsh, of New York City, Murray Smith, of Dayton, Ohio, George Hoadly, of Cincinnati, Ohio, and Rollin Browne, of New York City, on the brief), for Dayton Airplane Co.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

DENISON, Circuit Judge. In 1917 and 1918 the United States, hereinafter called the plaintiff, and the Dayton Airplane Company, hereinafter called the defendant, entered into

a series of cost-plus contracts for the building of airplanes for various war purposes. The last contract superseded the others in most particulars, and contained detailed and elaborate provisions for the conduct of affairs under it and for the steps to be taken in the final settlement thereof. Performance of it, as later modified, was finished in March, 1919. Thereupon an adjustment of most of the matters involved was negotiated and agreed upon, whereby defendant was paid in full for all its allowed claims, and the matter apparently closed, except that a few relatively small items were not covered, and for them defendant continued to prosecute its claims before the proper Departmental Board.[1] Later, the successor Board concluded that large overpayments had been made by the plaintiff to defendant; and for the amounts so found, plaintiff brought this suit. The claims for which it declared aggregated about $2,500,000, made up of nine items. The case having been transferred to the equity docket, and coming on for trial accordingly, plaintiff abandoned two of the items; upon four defendant prevailed; and upon two and a part of another plaintiff had judgment for about $525,000. From this the defendant appeals. Plaintiff appeals from the disallowance of interest and from the failure to award recovery upon three of the items claimed. Details can be better stated in connection with the items.

[1] It is first to be observed that this contract and the actions under it were not made or taken by officers who must find in a statute clear authority for their every act. In such contracts with such an officer the public is dealing with an agent of known and limited powers. Once beyond these powers, principles of estoppel or fair dealing have no application against his principal. Here the scope of the contract was not limited by any statute. The government was acting by the Secretary of War, in a national emergency of the first class. His discretion was unlimited; it must be exercised through subordinates; in the absence of fraud or bad faith, the exercise of such delegated authority is the Secretary's exercise of it. Rules of estoppel and fair dealing apply in full force as with individuals. In this class of contracts, and for effect on future emergencies, if for no other reason, a sound public policy must require that the government keep its contracts and stand by its settlements as an individual must. In that atmosphere the questions of this case are to be approached. Clark v. U. S., 95 U. S. 539, 544, 24 L. Ed. 518; Daniels v. Tearney, 102 U. S. 415, 422, 26 L. Ed. 187; St. Louis Hay & Grain Co. v. U. S., 191 U. S. 159, 24 S. Ct. 47, 48 L. Ed. 130; U. S. v. Atlantic Co., 253 U. S. 1, 40 S. Ct. 423, 64 L. Ed. 735; McArthur v. U. S., 258 U. S. 11, 12, 42 S. Ct. 225, 66 L. Ed. 433; Freund v. U. S., 260 U. S. 60, 61, 43 S. Ct. 70, 67 L. Ed. 131; Reading Co. v. U. S., 268 U. S. 186, 188, 45 S. Ct. 469, 69 L. Ed. 907.

The record is rather barren as to the division of departmental authority. We think we may rightly infer that next to the Secretary of War, after the reorganization of the Air Service as a separate branch of the army, largely superseding the Signal Service, was a major general, in charge of that entire service; that the Air Service was divided into divisions and/or bureaus; that the Bureau of Aircraft Production had charge of making contracts and the Division of Finance directed the making of payments thereon, and necessarily the determination of the proper amount, except as there was later set up the Claims Board of the Air Service, which was the appellate and the final departmental arbiter as to the amounts due to all contractors in this service. The record shows that Lieut. Guthrie was assigned to the defendant's plant, in the early part of the time, as assistant accounting officer, then as accounting officer, and later taking the title of finance officer. He was in frequent consultation with his immediate superior, who was Capt. Ong, and who was district finance officer "A. S. A. P." (Air Service Aircraft Production). If questions arose as to which these officers did not wish to make a decision, they consulted the Chief of the Finance Division, A. S. A. P., at Washington, Lieut. Col. Downey. With these aids a tentative decision was reached, whereupon the accounting officer either issued a voucher entitling defendant to payment, or held the matter in suspense.

No contention is made that any officer who, or board which, purported to exercise the authority of the War Department in taking the various actions shown by the record, did not have and exercise the full authority of the War Department in that respect, save as such action was subject to current revision by the departmental superiors.

During the contract performance, plaintiff had paid to defendant some $30,000,000 on

---

[1] We find no tenable basis for the theory of the successor Board that the contract had not been performed or terminated but only suspended, so that power remained in that Board to readjust and redetermine everything.

account of the amounts being earned. After performance, these payments were reviewed, further claims were considered, and a complete account was stated by the proper accounting officers of the Air Service in the War Department. These results were embodied in contract Exhibit 1816–C, signed by the parties. It contained an express release from the defendant to plaintiff, covering all liabilities in the subject-matter. It did not contain, in terms, any release of any claims by plaintiff against defendant; but there was no suggestion of the existence of any such claim. The accounts had shown large sums due from plaintiff to defendant; the net result had been reached by the rejecting of some claims which defendant was making against plaintiff and by overruling some objections which plaintiff was making against defendant's claims. It was a complete accord; and it was promptly satisfied by the payment by plaintiff to defendant of the full amount so found due. The procedure, more fully stated, had been that, from time to time, plaintiff paid the greater part of the bills rendered under the contract; that from time to time plaintiff's representative raised questions about certain items, which thereupon were laid over for further consideration; that, after the completion of the contract, all these accumulated matters and claims back and forth, as well as defendant's claims presented as for final settlement, were discussed by defendant's officers with plaintiff's officer at Washington, in direct charge of such settlements; that he decided all matters in controversy; that his decision was formulated into contract 1816–C; that a further reviewing authority had been reserved to the Claims Board in the Air Service, and so contract 1816–C was expressly made subject to the approval of that board; that it was so approved by that board; and it was then completely performed by payment. It is quite apparent that this ended the matter, unless the plaintiff could show sufficient reasons for setting aside this settlement; and such reasons must be found in mistake or in bad faith, fraud, or overreaching on the part of defendant's officers. Neither the original nor the amended complaint charged any bad faith, fraud, or overreaching, except in one matter of appraisal, nor charged any mutual mistake, unless such charge could be found in the theory that some of the items allowed and paid to the defendant were wholly unauthorized by the contract.

Not only does the evidence demonstrate a definite and final settlement in the nature of an accord and satisfaction, but there are express contract provisions as to the finality of decisions so reached. The contract provided for the constant representation of the plaintiff at the plant by an "accounting officer," who continuously computed and ascertained the state of accounts. Article VIII, § 11, provides "that a final adjustment [of the accounts due or payable hereunder] shall be made upon the termination of the contract, and that any and all amounts then due by either of the parties hereto to the other shall be immediately paid." Article IX provides: "The decision of the accounting officer on questions of the determination and allowance of payments shall prevail, except that either upon the completion of the contract by the contractor or its termination by the government, or whenever claims amounting in the aggregate to $5,000.00 shall have been disallowed by the said accounting officer, the contractor may appeal to a board consisting of three persons appointed by the Director of Aircraft Production, whose decision shall be final and binding upon both parties." Every matter which has been in controversy in this litigation is a "question of the determination and allowance of payments." We see no distinction between the words "shall prevail" and "shall be final and conclusive," particularly when the latter words are used to describe the effect of an appeal from the decision characterized by the former words. It is not to be supposed that the decision of this accounting officer should "prevail" against one party and not against the other, or that a conclusion, an appeal from which is to be final or conclusive, has any less than final force itself if there is no appeal.

It is further to be noted that every question now in dispute (save appraisal, otherwise controlled) was of a character fit to be finally decided by the accounting officer on the ground at the time, or his superior officers, whose decisions would become his. The true meaning of "actual cost of production," "indirect labor," "other items of overhead," "all expenditures in connection with this contract," "other manufacturing expenses necessary," etc., as used in such a contract, can be decided by a court in later litigation, but they can better be decided by the participating engineer or accountant. In this spirit, the contract provides (article XXII) that the Director of Aircraft Production shall be the final arbiter of "any and all disputes arising hereunder." The accounting officer, the division finance officer, the Chief of Finance Division, and the Claims Board were

all agencies of the Director, and their deci-sions, unappealed· from, were his.

[2] It is urged that a decision of the account-ing·officer was not intended to have this final character, because the contract requires the defendant to preserve for six years all its accounts and records subject to examination by the plaintiff; and it is said that this pro-vision is inconsistent. with the claimed final-ity. We. do not so regard it. Arbitration, no matter how final and binding, may always be revised and set aside upon proof of mis-take or fraud; and the contingency that the award or decision might later be challenged on one of these grounds fully justifies and satisfies the provision for keeping the records.

[3] We conclude, upon the ground of the contract finality of the decisions of the Air-craft Service officers, as well as upon the ground of agreed compromise and settlement, the contract evidenced by 1816–C is not to be impeached unless for mistake or fraud. U. S. v. Mason, 260 U. S. 323, 43 S. Ct. 128, 67 L. Ed. 286; U. S. v. Fuller (8 C. C. A.) 14 F.(2d) 813, 827; U. S. v. Bentley (6 C. C. A.) 16 F.(2d) 895, 897; Ohio Sav. Bank & Trust Co. v. Willys Corp. (3 C. C. A. Dec. 1926), 16 F.(2d) 859.

[4] The chief item in controversy relates to the valuation of the plant. The contract re-cited that defendant had provided itself with a large and expensive. outfit of land and buildings for the performance of these con-tracts. It was agreed that the complete cost to the defendant of these lands and improve-ments should stand to defendant's credit in the final settlement, and that the manufactur-ing accounts should be charged from time to time with the actual depreciation of the prop-erty accruing while in use. This actual or ac-crued depreciation was to constitute, and was in effect treated as, a part of the expense of operation from month to month in determin-ing the cost of production. The contract fur-ther provided that, in the final settlement and before having this property turned back to defendant for its further private use, the de-fendant should. be credited with any special depreciation resulting from the difference be-tween original cost and the then market value, due to the lack of any ready sale or any normal market for property which had been constructed or acquired for war purposes, but the need of which, in industries after the war, might be nonexistent. A provision of this kind was obviously appropriate and fair. This particular provision is said to be accord-ing to the standard form of similar cost-plus contracts, which form was prepared under the direction of the War Department by a joint commission of army officers and business men. It is quoted in the margin.[2]

It specified that the market value, as thus affected, should be fixed by a board of ap-praisers like arbitrators. This was done; and this board fixed all values, and found and stated that this special depreciation was (upon the plant acquired from the Domestic Building Company) about $514,000. In de-termining the amount to be paid and which was paid by the plaintiff, effect was given to this figure. The trial court found that this special depreciation was erroneously allowed. The sole pleading complaint on this score was that this appraisal was the result of mistake, or fraud, and should be vacated. The trial court. did not, however, find any fraud or mistake upon the part of the board in fixing this amount; nor can we. The appraisers, including the umpire, are criticized because their action was hasty. We cannot adopt this criticism. The umpire was able and impar-tial. He had been constantly familiar with this great plant, and with the commercial

2 "*Depreciation.*—Depreciation shall be deter-mined as follows: The cost to the contractor of its plant, including real estate, buildings, ma-chinery, and appliances, built or otherwise ac-quired for the performance of this contract at the date of their acquisition, shall be determin-ed. It is represented by the contractor that such cost so defined is, in respect to real es-tate, buildings, and power plant comprised within that portion of their plant acquired from the Domestic Building Company, the actual cost of the purchase hereof by the contractor from Domestic Building Company; and further that such cost to the contractor is the amount of. the actual cost (as defined) to the said Domes-tic Building Company and the contractor here-by undertakes that the records of such cost shall be made accessible to the accounting of-ficer forthwith for confirmation or adjustment and determination,. the accounting officer to'pro-ceed immediately to examine the same and to advise the contractor thereof with due diligence. The fair market value of the same property as at the date of the completion or. cancellation of this contract shall be determined by a board of three appraisers, one selected by the govern-ment, one selected by the contractor, and a third selected by these two. The need or re-quirement for a factory building or completed plant of the size and character of the contrac-tor's plant in the neighborhood where located, and the probability of the contractor securing a tenant promptly or having an established busi-ness available to occupy the premises at a fair rental, shall be considered as one of the im-portant factors to be taken into account in ar-riving at a fair market value of the plant at the termination of the contract; the weight to be given thereto being left to the sound discre-tion of the appraisers. If the said cost price of the same property shall exceed the said fair market value thereof, the government shall pay to the contractor this difference less the depre-ciation already paid on the same property."

situation which depreciated its market value. After only brief specific attention, he was just as competent to fix this depreciation, relying upon his judgment of the familiar situation, as he would have been after much delay and hearing many witnesses. It is as obvious from this record as it was to every one at the time that, whether the fair valuation of this property for turning back to defendant under the contract should approximate the reproduction value less accrued depreciation, or should be a much smaller sum, dependent on the property's availability for any manufacturing purpose which could utilize so vast a plant, was a question expressly decided by the contract.

On behalf of the plaintiff, it is urged that the appraisal is such a gross undervaluation as to furnish inherent evidence of a mistake or of a reckless indifference equivalent to fraud. The only support which plaintiff claims for this conclusion is found in the subsequent history of the property. All the evidence on the subject is undisputed; and we find nothing dictating that inference. A few weeks after the appraisal and in connection with the final settlement and a temporary leasing of the plant thereafter to the plaintiff, defendant offered to sell the plant, including some items added, to the plaintiff for precisely this appraised value at which it and they had been charged against defendant in the settlement, after deducting this depreciation, and which may be roundly stated as $645,000. That the United States held for many months an option to buy this property at this appraised price, finally letting it lapse, does not confirm the theory that this appraised value was fixed at an unreasonably low figure, in order to take advantage of the United States. A few months later defendant sold the property to the General Motors Corporation, still subject to this option or right of purchase by the plaintiff at this appraised price. The fact clearly is, in our judgment, that the sale price from the defendant to the General Motors Corporation was this same appraisal value, plus additions, viz. $645,000. Confusion about this comes, we think, from observing only the final entries upon the ledger of the General Motors Corporation, and from not giving proper force to the original data and memoranda upon which these entries were based. The general negotiations for sale and the final sale cover not only this particular plant but other property belonging to defendant and other properties belonging to an allied corporation and also a contract for the personal service of Mr. Ketter-

ing, who was a stockholder of defendant and the other allied corporation. The entire consideration paid by the General Motors Corporation for everything was about $8,000,000, paid in its capital stock at par ($100, the stock then having a stated value of $88 per share). No doubt the tying-up contract with Mr. Kettering was one of the great objects of the purchaser in this transaction, which was undertaken and carried through as an entity, so that it was not very important to the purchaser what valuation was entered on its books for the tangible property; but everything was separately and distinctly valued in the various memoranda and the instructions given to the bookkeepers. In the preliminary contract this plant was given a valuation of $500,000, but this was expressly said to be an estimate. When the final distribution was made upon the memorandum of instructions, it was given precisely the foregoing appraised value, as modified by additions and changes after the appraisal. Some of the property covered by the general purchase was bought directly and some was acquired through purchase of the stocks of formerly owning corporations. The net result was that about five and a half million dollars were charged either to "investments" or "investments in allied corporations," and about two and a half million dollars were charged to "good will." This particular tangible property, at the same appraised value, formed one of the items making up the total charge to "investments." These facts all support rather than contradict the inference that the sale price of this particular plant should be taken as $645,000, approximately, and not as some indefinitely greater sum.

In this connection plaintiff further shows that about a year later the General Motors Corporation, in connection with the separation of properties which it was then making among subsidiaries, entered this particular plant on its books at the valuation of nearly $2,000,000. However relevant such a valuation might be, the evidence was, when offered, plainly incompetent, because it was merely the unsworn statement of a stranger to the suit, being a corporation not connected with defendant save in the indirect way that the former stockholders of defendant had become holders of a relatively trifling fraction of the stock of the General Motors Corporation. Later, the defendant, perhaps feeling compelled by the presence of this testimony in the record, introduced as witnesses the officers of the General Motors Corporation who had

charge of this revaluation. Their explanation of what it was and of the reasons for it is not improbable, is not disputed, and should be accepted. They say that the General Motors Corporation, having acquired several enterprises with large good will items, like this one, found its good will account on its books at an unsatisfactorily high figure. It therefore determined upon the general policy of reappraising its physical properties at reproduction value, less depreciation; and it had such an appraisal made of its various properties, including this one; the appraisal being made by professional appraisers of good standing. The result was that the book valuations of many properties, including this one, were largely increased and the good will account on its books was correspondingly decreased, leaving its capital stock account unchanged. It is familiar knowledge that in 1920 or 1921, the reproduction value of such a plant would have been much greater than its cost in 1916 and that such reproduction value would not of itself control its market value, but that the market value of such a plant in 1919 or 1920 would be highly speculative, depending upon finding a purchaser with need therefor. Upon the whole we do not think that the sale to the General Motors Corporation nor the revaluation by that corporation substantially tends to impeach the fairness of the appraisal by the appraisal board.

[5] Although the District Court reached the conclusion, as we also do, that the appraisal could not be set aside upon any ground alleged or proved, that court was seemingly convinced, as we cannot be from the record, that the fair market value was greater than the appraisal by the amount at least of this special depreciation. So the court came to consider the making of the contract which had expressly provided that this special depreciation allowance, on account of the unsalability of the plant, should be taken into account on final settlement; and it concluded that this provision of the contract should be set aside or disregarded because so manifestly unfair to the plaintiff that it must have been included by the inadvertence of plaintiff's officers or through overreaching by defendant. We pass by, without consideration, the lack of pleading allegation which would justify this treatment of the contract; and we do so because the court below could, and perhaps would, upon proper terms, have permitted the pleadings to be amended so far as necessary. We pass by, also without consideration, the difficulties inherent in setting aside one element

or provision only of a contract covering many closely interrelated subjects; and we take up the meritorious question considered by the trial court in this connection. Its view was that this special depreciation was dependent mainly on the fact that this plant, intended to employ 5,000 or more workmen, was situated several miles from Dayton, the nearest place where workmen could live, and that this fact made it so unsuitable for any business to which it would otherwise be adapted as to cause this lessened valuation. The appraisal shows that this element, location, was given effect by the board, but shows, too, that the finding of special depreciation was dependent also upon another element. The great size of the plant made it, in 1919, relatively unsalable, regardless of location. It is familiar knowledge that at that time such plants usually could not be sold, except at sacrifice prices. So we cannot fully accept this view by the court below; but, resting on this premise, it found further that this loss had been already suffered by defendant or its predecessor in title before the contract with plaintiff had been made, and hence that there was no justification for permitting defendant to recoup the loss, in the final settlement of this contract. This conclusion was supported first by the view that, although the sum fixed upon had been the actual cost to the defendant upon its recent purchase of the property from another company, yet, on account of the identity of the two companies, the sale price was not controlling, and that, in any event, the contract was too late in date to reach back to that sale for a measure. To consider the force of the first view requires a further statement of facts. Three men, Messrs. Deeds, Kettering, and Talbot were, or had been largely interested in some or all of various Dayton corporations. Among these were the Dayton Engineering Laboratories Company ("Delco"), the Dayton Metal Products Company, the Domestic Building Company, the Delco Light Company and the recently organized defendant, the Dayton Airplane Company. Prior to the first government contract with defendant, the Talbots and Kettering had become nearly sole stockholders (two-thirds and one-third) in the Metal Products Company and in defendant, and Kettering owned only a minority interest in the Domestic Building Company. The Talbots were not then interested in Delco or Delco Light or Domestic Building. Kettering was the only common stockholder in the two corporations, vendor and vendee, and he did not control either. Clearly the sale was not by one company to

itself under another name, and the sale price cannot be, for that reason, disregarded. However, the existing personal and the former business relations between these various stockholders were so intimate that perhaps a court of equity should not be particularly impressed by the sale price which they had fixed. In our view, it is not this sale price which is important, but rather the actual cost to the vendor just recently incurred. Coming again to the facts:

The defendant had quarters in and near Dayton which had been sufficient for its relatively small needs. The Delco Light Company, also operating in Dayton, had been greatly expanding and was looked upon as needing a very large plant. Accordingly, the parties interested, through the medium of the Domestic Building Company, had planned for and substantially finished a plant intended for the Delco Light Company at this point, several miles from Dayton, where there were good transportation facilities but no dwellings. Recognizing the handicap of having to bring labor daily from such a distance, it had been a part of 'the plan to build near the plant the necessary large number of dwellings, and, in anticipation, this had been named Moraine City. At the time involved, only a few houses had been built, but 'the plan was progressing. It was obviously the judgment of the capable business men who were the promoters that, in connection with this plan for house building, the location was suitable for and would be acceptable to the Delco Light Company for carrying on its anticipated business. It is equally plain that if such a plant were erected at such a place, but without providing dwellings for the labor and without knowledge of what use could be made of such factory, its unsuitability for sale upon the general market would immediately greatly depreciate its production cost; but, in connection with the existing plans, there is no reason to doubt that it was fairly worth its full cost. The enterprise was at this stage, when, about the time the United States entered the war, the demand became urgent for immediate aircraft production upon an immense scale and with great speed. The defendant was as well fitted as any concern in the country, if not better, to be used as a basis for the development of facilities to supply this demand; but, to undertake to do so, it must have a great increase in manufacturing facilities with the utmost speed. It was at once apparent that this proposed and still incomplete Delco Light plant was the most suitable property available, and the as-sociated parties controlling these corporations, Domestic Building Company and Delco Light Company, offered for that purpose to turn this plant over to the defendant and to let the Delco Light Company meet its needs in some other way.

Under these circumstances something might have been said to justify the demand of a substantial bonus to the Delco Light Company for abandoning its new plant to the defendant, and practically to the needs of the United States; but it was arranged that the plant should be sold to the defendant at its exact cost to the erector, the Domestic Building Company, whereby this same figure became the cost of the plant to the defendant. In these transactions we find no basis for adverse criticism, nor can we see that the defendant was planning to recoup from the United States a loss which had already been suffered by the improvidence of the promoters; on the contrary, the arrangement seems completely fair and just to the United States.

The only way we can see in which it might be urged that the builders had already suffered a loss by erecting a great factory for which, under future conditions, they might not find a purchaser, is to say that the suddenly developed war conditions had already upset the plans of the Delco Light Company for its future business, and so the erection of this plant had become a mistake. Not only do we find no basis in the record for this conclusion but, if true, it would hardly be a controlling equity as against the fairness of the contract in question.

We do not overlook the respective dates involved. In May, 1917, a group including Mr. Howard Coffin, the Chairman of the Aircraft Board, and Col. Foulois, the assistant to the head of the Army Air Service (then Signal Corps), came to Dayton and invited proposals from defendant for a relatively small number of training planes. In June, they came again and discussed the possibility of a large contract for battle planes. They then made the suggestion, or at least approved it, that the new Delco Light plant was ideally adapted for large scale airplane building and ought to be made available to defendant for that purpose. Accordingly the transfer of title was arranged, and the sale made "in the summer of 1917." It is to be assumed that the preparation of the property for its new use went forward with all possible speed, though the first contract, 1495, for 400 training planes, was not actually executed until August 1, 1917. Contract 1816, superseding 1495 as to training planes, and covering also

3,500 battle planes, was dated September 7, 1917. Contract 1816–1, on January 17, 1918, modified 1816 in various items. On April 1, 1918, contract 1816–A, superseded and modified the former ones; and contract 1816–B, which is the direct subject of the litigation and superseded all the others as to all the work (no planes except the 400 having then been delivered), was signed on October 15, 1918. It is now said that the special depreciation clause of contract 1816–B cannot be applied to this situation, because the property had been bought by defendant before the contract was made and hence could not have been "acquired for the performance of this contract." That is too narrow a construction. This contract was in continuation of and substitution for the one of September 7, 1917 (1816), containing this identical language; and there is no reason to doubt that this property was acquired expressly for the performance of the contemplated contract or contracts, of which 1816 very soon became the agreed embodiment.

Nor do we overlook the contention that the adoption of the original building cost as the base of the special depreciation computation was the gradual development of a cunning scheme and was probably "slipped over" on the plaintiff's officers, without their clear comprehension. This provision was, of course, not found in the contract of August 1st (1495), because that provided for the manufacture and sale of planes at a flat price. No question of plant cost or of depreciation was possibly involved. In the first cost-plus contract (1816) the provision appears in language substantially identical with this. It is stated in such clear detail that it could not have been misunderstood by the captain who signed as contracting officer, the general who signed as Chief of the Signal Corps, and the able lawyer who had advised them in the matter and who signed as a witness (Mr. Harris). The only distinction between the provision as found in 1816, and as found again in 1816–B, is that the former contained a clause that this cost base "should not exceed a fair cost," and this clause is omitted from the latter. The argument is that "fair cost" meant "market value at the time," and hence that, if there had been a depreciation already suffered at the date of 1816, the cost base must be correspondingly reduced. We cannot give any such interpretation to "fair cost." One who means "present market value" does not say "cost." If "fair cost" had in this situation any meaning distinctive from that of "actual cost," it was "prudent investment cost"; and there is no suggestion in the record that the actual cost was not the fair and prudent cost. Any explanation needed for the omission of this clause in the second contract, may be found in the fact that, at its date, the plant accounting officer had made the contemplated inquiry and had fixed the cost base in accord with contract 1816, and had been using it for many months as the basis of computing current monthly actual depreciation. The repetition in the latter contract of the provisions for inquiry into actual cost was seemingly unnecessary, but might have been advisable as a safeguard against errors which might later be found.

From the views so far expressed, it results that the decree below must be reversed so far as it awards to plaintiff the item of special depreciation.

The decree below also awarded to plaintiff the refund of about $30,000, which had been paid to defendant for the cost of maintenance of a recreation and amusement park, used during the contract period by the employees and their families. The contract provided that the operating cost should include "expenses of operation and maintenance of plant hospitals; also medicines and supplies for first aid to the injured, expenditures for hospitals and other organizations to cover a definite benefit to employees"; also "expenses in connection with employees' welfare, such as group insurance, conducting club rooms, reading rooms, and educational classes." During the performance of the contract practically all of defendant's employees lived in the city of Dayton; and in that city defendant, in association with other companies engaged in war work, maintained an amusement park. This was used only by employees engaged in war work. If the park had been maintained at the plant and by defendant alone, there would hardly be a contention that it was not welfare work in a broad sense, because contributing to the efficiency of the employees, and so a proper item of operating expense. The clause, "such as group insurance, conducting club rooms, etc.," is claimed to be a limitation, but it, at the most, gives rise to ambiguity. We do not see that the sharing of the park with other similar employees, working indirectly for the United States, or its location away from the plant and where alone it was accessible to the employees' families, makes any difference. In this situation, the expenses of maintenance were at first regularly credited up and paid to defendant. Later these items were suspended, and finally the whole accumulated

item was submitted, as above explained, by the defendant and the plant accounting officer to Col. Downey, Chief of the Finance Division, A. S., and it was allowed by him. This was a practical construction by both parties to the contract of an ambiguity in it. It was deliberately adopted, after the question was raised and while it was fresh, by those who had lived in the atmosphere of the contract and knew its spirit. The adoption of this meaning was an element of the general settlement then reached. That meaning should not be afterwards repudiated by the party who declared it, even if the contrary view might years later seem the stronger one.

The remaining item of refund allowed to plaintiff in the court below was the sum of about $17,000, being the cost of taking certain motion pictures. The contract provided that the defendant should refrain from publishing any figures or other data disclosing the process of manufacture. It also provided that all pictures relating in any way to the progress of the work which the defendant might desire to publish it should submit before publishing the same to the Director of Aircraft Production, who might permit such publication and should have the right to censor the same. During the progress of the work, there was great difficulty in obtaining labor. Defendant thought that, by taking moving pictures of the production work and its results, and by exhibiting these pictures in the nearby territory, interest and enthusiasm could be created and much additional labor be recruited. The plan was submitted to the assistant director of Aircraft Production, who answered the contract definition of that "contracting officer" who was to "represent" the plaintiff during execution. He fully approved; and thereupon defendant caused the pictures to be taken, and paid therefor the item in question. The question as to their exhibition then arose. The film was then deposited in Washington with Col. Churchill of the Military Intelligence Division. Later Col. Churchill advised defendant of the decision of the Secretary of War, that the film might be retained by defendant for private exhibition among its employees only, or that it could be turned over to the Committee on Public Information for such public use as the Committee might think wise, in which case the defendant would be reimbursed for its cost expenditures. The chairman of this Committee, the "Creel Committee," asked that the film be turned over to it, and this was done. What use was made of the film by this Committee does not appear.

[6] Save for the express prohibition in the contract against publication of pictures, there was then little or no doubt that the cost of this film might rightly have been considered as "indirect labor" (paragraph 4, Schedule A), or overhead; but the publication which is prohibited cannot be intended to be merely that private showing to a few persons which would be inherent in the making of the pictures, before they could be submitted to the Director for his approval and censorship; the prohibition of publication must refer to the giving of some general publicity. The permission and approval given by the assistant director cannot be overlooked. The contractor producing war-time necessities for the government, and who comes for instructions to the officer apparently in charge of the subject-matter, can hardly demand from that officer a written letter of authority from his immediate or remote superior before the conference is undertaken. We may take judicial notice, that the Director of Aircraft Production, like the Secretary of War himself, must act through his authorized representatives, and that, especially in war time, a contract must contemplate such representation.

The case is not one where it appears that the assistant did not have the delegation of authority which the contractor might rightfully have supposed; that would present another question. From this record there is no reason to doubt that the assistant director did have the authority which he seemed to have.

These considerations alone would support the allowance of the claim made by the Director of the Finance Division, as a contemporaneous construction of permissible "expense," regardless of whether or not permission to publish was subsequently had. The allowance may also be well supported upon the express promise of the Secretary of War, made through Col. Churchill, that if this film was turned over to the Creel Committee for its use, the cost would be repaid to the defendant. True, upon that theory, an independent action might be maintained by defendant in the Court of Claims; but that ought not to be the exclusive remedy, where the subject was merely one item in the execution of the contract, was actually taken into account by the plaintiff in its settlement of accounts under that contract, and was paid in full. That circuity of action should not be necessary.

[7] The three items thus far considered upon their merits are also very well controlled by the theory of accord and satisfaction or compromise and settlement, already discussed.

It is true that, at the time when various items then in dispute were submitted to the Chief of the Finance Division and by him disposed of in a way that was acquiesced in by all, no controversy had been raised as to the item of special depreciation. The appraisal had been made, and the voucher for the item had been prepared. No one questioned its propriety. At the same time, it underlay all the suspense items which were submitted to Col. Downey. It was expressly mentioned and approved in contract 1816–C, which evidenced the final adjustment. The effect of this lack of contest would be different if there were any way to restore defendant to the position it would have had if this item had been contested and denied. It is at least probable that defendant would then have exercised its right of appeal, both as to. this and the other items which were denied. The allowance without contest of the special depreciation was a part of the consideration leading to defendant's acquiescence in the denial of the other items; but, however much the effect of the settlement contract may be thus minimized as to the special depreciation item, this disparagement does not extend to the amusement park and motion picture items. They were contested, and their allowance was deliberately considered.

It is also argued that the items disallowed by the. Chief of the Finance Division were claims of such tenuous character that they do not carry substantial appeal to a court of equity on the ground that acquiescence by all in their disallowance makes it improper later to open up the general account. The items submitted for allowance amounted to about $1,000,000. About $200,000 were allowed and $800,000 rejected. The largest item of the latter class was a claim for $500,000, arising because the existing contract at one time called for 5,000 planes and provided for paying the contractor a percentage of the saving made by him in the actual cost as compared with the then estimated and stated "bogey" cost. Later there was a modification by which the "bogey" cost and percentage were changed, so reducing the contractor's profit. Defendant consented to this change, upon the oral assurance that the reserved right of cancellation should not be exercised.. Later this right was, in effect, exercised, and the change in the contract as to the profit basis resulted in. this loss of profits upon the planes actually made and delivered. The claim was perhaps more accurately one for damages than for profits, and it very likely did not have legal standing; at the same time, it had some equitable appeal, and could have been pressed on review. The remaining $300,000 of items present, so far as we may judge, only claims of the class likely to arise under such a contract, and most of which might or might not, upon consideration, turn out to be rightful. We think the due effect of these allowances and disallowances and the acquiescence therein cannot be avoided on the ground of obvious lack of merit in the items disallowed.

As the account between the parties was left by the performance of the final settlement, 1816–C, the defendant's profits were such that it was compelled to and did pay to the United States war profit and income surtaxes which in their upper brackets amounted to, say, 75 per cent. of the profits. The refunds ordered by the court below were all taken in effect from these upper brackets, and defendant accordingly claimed that there should be a decree against it for only 25 per cent. of whatever refunds were found proper. Our disposition of the main questions makes it unnecessary to consider defendant's complaint with regard to the action of the trial court upon this subject-matter.

Upon the cross-appeal, the comment just made applies to the subject-matter of interest upon the refunds concerning the disallowance of which interest the plaintiff complains and appeals.

[8] The three remaining items of the cross-appeal pertain to the action of the trial court in refusing to disturb the allowance to the defendant. and the payment to it of the sums claimed for the services of public accountants, $62,000, for money paid for railroad transportation of employees, $137,000, and for "bonus for savings," $850,000. As to all three of these items, the District Court held that they were either expressly or fairly a part of the expenses or profits to which defendant was entitled by the terms of the contract. As to the first two, we see no occasion for further detailed discussion, and we affirm the court below. As to the third, the bonus for savings, the complaint is that, although the contract expressly provides therefor, it is to that extent void because against public policy, and that this position is emphasized in the present case by the unconscionable amount of profits resulting to defendant. This provision was common in governmental contracts during the war. Although it is said to have been new in governmental contracts at that time, it had long been common in private. building contracts; indeed, it was almost a necessary corollary or incident of a cost-plus contract. Much is to be said both for and against the economic good policy of

"cost-plus" contracts for governmental work; but it is well known that, during the war emergency, they seemed to be necessary, and that they were authorized and employed to a, very great extent. To preserve the motive of self-interest on the part of the contractor and yet to neutralize any tendency on his part to increase his percentage by increasing cost, the theory was adopted that the parties should agree upon an estimated price, which would be the probable cost as near as they could foresee, and that then the contractor should be allowed, in addition to his flat percentage, a portion of any savings which he was able to make below the estimated or "bogey" price. In this case that bonus was 25 per cent., and, as computed, it amounted to the sum named. [9] With regard to plaintiff's claim that this provision was against public policy, it is enough to say that no authorities are cited to that effect, and that, for the courts to undertake, years afterwards, to set aside a wartime contract of the government because against public policy should be and is, in our judgment, quite impossible. Even if the subject were otherwise open, it would be difficult to set aside only one contract provision which formed a part of the consideration for the counter promises.

Nor are we impressed that defendant's profits were so unconscionable as to justify taking them away upon any vague grounds, if indeed, that might ever be done. The contract, or rather the series of contracts which were practically a unit, occupied some 18 months; the original capital invested was about $1,000,000 but, with borrowed money, general debts, and reinvested profits, the average capital employed during the last year was some $5,000,000. The total cost to defendant of its output was some $27,000,000, and its final net profit from these contracts, after it had paid the excess profits taxes imposed to meet this kind of a situation, was about $1,000,000. Plaintiff proposes to find a reasonable profit by computing an annual per cent., of customary amount, upon the original capital investment; on the other hand, where much additional capital is borrowed and both business and reputation, indeed financial existence, are involved, business men commonly compare their profit with their output. Upon this basis the profit, even including bonus, was not over 4 per cent. We agree with the District Judge that, under the circumstances, "the actual profits of manufacture [excluding special depreciation] were neither exorbitant nor excessive."

Upon the entire record, the case will be remanded, with instructions to dismiss the bill.