UNITED STATES v. BETHLEHEM STEEL CORPORATION et al.

BETHLEHEM SHIPBUILDING CORPORATION, Limited, v. UNITED STATES SHIPPING BOARD MERCHANT FLEET CORPORATION.

UNITED STATES SHIPPING BOARD MERCHANT FLEET CORPORATION v. BETHLEHEM SHIPBUILDING CORPORATION, Limited.

Nos. 7045, 7119, 7046.

Circuit Court of Appeals, Third Circuit.

June 18, 1940.

Francis M. Shea, Asst. Atty. Gen., J. Cullen Ganey, U. S. Atty., of Philadelphia, Pa., Carl F. Farbach, General Counsel, U. S. Maritime Commission, Paul D. Page, Jr., and Hardin B. Price, all of Washington, D. C. (Frederick Bernays Wiener, of Providence, R. I., of counsel), for United States and United States Shipping Board Merchant Fleet Corporation.

Richardson Dilworth, and Evans, Bayard & Frick, all of Philadelphia, Pa. (Frederick H. Wood, and William W. Robison, both of New York City, of counsel), for appellees in Nos. 7045 and 7046.

Richardson Dilworth and Evans, Bayard & Frick, all of Philadelphia, Pa. (Frederick H. Wood, and William W. Robison, both of New York City, of counsel), for plaintiff-appellant in No. 7119, Bethlehem Shipbuilding Corporation, Ltd.

Frederick Bernays Weiner, of Washington, D. C., for appellee in 7119 United States Shipping Board Merchant Fleet Corporation.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

MARIS, Circuit Judge.

In 1917 this country was at war. The war emergency made it necessary for the Government to take over all ships suitable for war purposes then under construction at the various shipyards throughout the United States and to arrange with shipbuilders for the construction of as many additional vessels as possible and to construct them with the utmost speed. In the fall of that year the United States Shipping Board Emergency Fleet Corporation (now known as United States Shipping Board Merchant Fleet Corporation and herein referred to as the Fleet Corporation), an agency of the Government, entered into negotiations for the construction of ships by the Bethlehem Shipbuilding Corporation, Ltd., (hereinafter referred to as Bethlehem), a subsidiary of the Bethlehem Steel Corporation, having a number of shipyards and an experienced shipbuilding organization. In these negotiations Bethlehem was represented by two competent shipbuilders, Joseph W. Powell and Harry Brown, and the Fleet Corporation was represented by two equally competent shipbuilding experts, Admiral F. T. Bowles and G. S. Radford, who were advised by and had full opportunity to advise with Daniel H. Cox, a competent naval engineer and estimater, and Chester. Cuthell, counsel for the Fleet Corporation. In addition to these representatives the interests of the Fleet Corporation were protected by Charles Piez, its vice president and general manager, who while not previously a shipbuilder was a nationally known business executive of long experience.

Three forms of contract were considered by the negotiators, a "lump sum" contract, a "cost plus" contract and a "cost plus fixed fee" contract with a "bonus for savings." The representatives of the Fleet Corporation endeavored to get Bethlehem to bid on a lump sum basis but it refused, stating in a letter of December 13, 1917, that "Because of the unprecedented conditions surrounding the Labor and Material market, it is impracticable to estimate within a reasonable percentage what will be the actual cost of construction, and it is therefore impossible to submit fixed prices for any of these vessels, except upon a basis so far above estimated cost that any figure acceptable to this Company would not be acceptable to the Emergency Fleet Corporation. It is proposed, however, that they be constructed on the basis of actual cost plus a fee, with an agreed upon probable cost, this Company to be paid in addition to the fee one-half of any saving that may be made below this cost figure, and with the further provision that the estimated cost figure will be increased due to any increase in rates of wages that may be approved by the Emergency Fleet Corporation."

On December 19, 1917, Admiral Bowles on behalf of the Fleet Corporation wrote

Bethlehem requesting it to submit proposals for the construction of certain ships which he specified. Under the same date Bethlehem submitted a written proposal to construct these ships under the bonus for savings form of contract, setting forth in its proposal the estimated cost of the vessels and the fixed profit to be paid. This proposal was the subject of further conference on January 3, 1918, at which Admiral Bowles unsuccessfully tried to persuade Powell to accept lump sum contracts but was finally persuaded to agree to accept the bonus for savings form of contract in order to reach any agreement at all. On January 5, 1918, Admiral Bowles and Radford transmitted Bethlehem's proposal to Piez with the following memorandum:

"We hand you herewith the Bethlehem Shipbuilding Corporation's proposal dated December 19, for additional construction at their various plants, amounting in all to 19 vessels, exclusive of tugs. It may be noted that, with the exception of three ships, the vessels in question are troop ships and tankers—ships of a type that only real shipbuilders can produce satisfactorily. As is well known, we have been having difficulty in placing such vessels.

"We wish to place on record the fact that the Bethlehem Shipbuilding Corporation's representatives have insisted on comparatively high prices for these vessels; that they have only with difficulty been persuaded to quote us on the types of ships referred to; and, that their attitude has been characterized by an arbitrary refusal to guarantee or stand behind delivery dates. In other words, it was difficult to persuade them to quote even a tentative delivery date, and they refused positively to accede to a bonus and penalty clause for delivery.

"The letter herewith, addressed to the Bethlehem Shipbuilding Corporation, in reply to their proposal, has been prepared for your signature and is now presented with the recommendation that it be signed. While the prices we have agreed to, with representatives of the Bethlehem Shipbuilding Corporation, are not satisfactory to us, nevertheless, they represent a material reduction from the prices quoted by that corporation. Realizing that the Nation will need these vessels, we have been actuated by the belief that further delay in placing the contracts should be eliminated and we believe that we have made the best compromise possible under very difficult conditions."

Prior to the receipt of this memorandum from Admiral Bowles and Radford, Piez had received a letter from Powell in anticipation of the final conference with Admiral Bowles. In this letter Powell agreed on behalf of Bethlehem "to accept the order to construct these vessels on such terms as may be personally determined by Mr. Charles Piez, the Vice President and General Manager." On January 5, 1918, after receiving from Admiral Bowles and Radford Bethlehem's proposal and their accompanying memorandum reluctantly recommending its acceptance, Piez on behalf of the Fleet Corporation awarded to Bethlehem seven contracts for the construction of a total of 21 tankers, eight cargo ships and 20 tugs upon the terms set forth in Bethlehem's proposal. The contracts, which were dated December 31, 1917, were actually signed and delivered about February 1, 1918. Subsequently in March, April and May six other contracts for the construction of 19 tankers and 18 cargo ships were executed between the parties upon substantially similar terms. All 13 of these contracts are involved in the present controversy. Five other contracts were also executed, one of them on February 1, 1918, and the others later. With them, however, we are not now concerned.

The total estimated cost of the 86 vessels involved, as set out in the contracts, was $119,750,000. The actual base cost of the ships as built was $92,990,520.91 and Bethlehem has been paid under the contracts the actual base cost of the ships, $92,990,520.91, the cost of extras, $16,381,432.15, fixed profits specified in the contracts, $11,962,400, and bonus for savings to the amount of $8,093,156.60. It will be seen that the total bonus for savings payable under the terms of the contracts would exceed $13,000,000, but the Fleet Corporation after paying Bethlehem $8,093,156.60 on this account declined to pay any more. A sum in excess of $5,000,000 is accordingly claimed by Bethlehem to be still due it from the Fleet Corporation.

The controversy with regard to the bonus for savings resulted in the institution of two suits in the District Court for the Eastern District of Pennsylvania. One was a suit in equity brought by the United States against Bethlehem Steel Corporation, Bethlehem Shipbuilding Corporation, Ltd., and certain subsidiary corporations for an accounting and to recover sums paid to the defendants or some of them under

the contracts above mentioned. The other was an action at law by Bethlehem against the Fleet Corporation to recover the balance of the bonus for savings claimed by Bethlehem under the contracts. A jury trial was waived in the law action and both suits were referred to a special master and referee for hearing. The special master and referee made findings of fact and conclusions of law and recommended the dismissal of the Government's bill in the equity case and the entry of judgment in the action at law for Bethlehem against the Fleet Corporation for $5,272,075.10, with interest from specified dates at the rate of 2% per annum. Exceptions having been filed, the district court upon consideration of the report of the special master and referee dismissed the bill in equity, entered judgment in the action at law for Bethlehem in the amount of $5,272,075.10, but without interest. The United States has appealed from the decree dismissing the bill in equity (No. 7045). From the judgment entered against it in the action at law the Fleet Corporation has appealed (No. 7046). Bethlehem has taken a cross-appeal in the action at law from the refusal of the district court to allow interest on the judgment entered in its favor (No. 7119).

In the pleadings and in the court below the chief contention of the Government was that Bethlehem was guilty of fraud in the making of the ship construction contracts to which we have referred. Both the master and the court below held that the charge of fraud in the making of the contracts was without foundation. So far as fraud in the ordinary sense is concerned we think that the evidence fully supports these findings. The Government, however, contends in this court that Bethlehem, by misleading statements and by withholding information, induced the Fleet Corporation's representatives to believe that Bethlehem's estimates of the construction cost of the vessels in question were fair and reasonable, and that the Fleet Corporation's representatives relied upon Bethlehem's express and tacit representations, and relying thereon executed the contracts under consideration. Under the circumstances, argues the Government, there was a duty of full disclosure resting on Bethlehem so that not having made such disclosure it must be held guilty of fraud. We have carefully considered the record in the light of this contention and we are com-

pelled to conclude that it is not sustained by the testimony, which in our judgment fully supports the findings of the master and the district court that at the time the contracts were negotiated conditions both as to labor, material and transportation, were such that it was impossible to make an accurate estimate of cost, that the estimates submitted by Bethlehem and prepared for it by its representative Brown were fairly and honestly made and as accurate as could be expected under the uncertain conditions then prevailing, that they were not intended to represent close estimates of actual cost and that they were not so understood, accepted or relied on by the representatives of the Fleet Corporation. On the other hand the evidence supports the finding of the special master that it was understood that Bethlehem intended these estimated cost figures to be sufficiently large to assure a bonus for savings at least large enough to offset all excess profits and war taxes which it might have to pay as a result of the contracts and that the estimated cost figures finally inserted in the contracts were arrived at by a process of barter and trade carried on by experienced and competent shipbuilders on both sides dealing at arm's length.

It is of course obvious that these negotiations took place in time of war when the need of the Government for ships was extremely urgent and the necessity of reaching an agreement with Bethlehem, therefore, vital. It is equally clear that Bethlehem insisted upon assuring itself a margin of profit which in view of the necessities of the Government was so large as to indicate an attitude of commercial greed but little diluted with patriotic feeling. There is no doubt that this attitude on the part of Bethlehem was deeply resented by the Government representatives but the latter were faced with the alternative of either agreeing to Bethlehem's terms or taking possession of its shipyards and having the Government itself construct the vessels. We think the record clearly indicates that the Government representatives felt that the latter course could not have accomplished the shipbuilding program with the speed which was essential. It was Bethlehem's existing shipbuilding organization that was necessary to insure success to the program of the Fleet Corporation. Consequently the Government representatives, feeling as they did that Bethlehem's organization was necessary to their program, were obliged to

accept the terms offered by Bethlehem. This they did with full knowledge, as we have said, that the estimated cost figures included in the contracts did not represent close approximations but were so prepared as to assure to Bethlehem substantial additional profits by way of the bonus for savings. It follows that while Bethlehem may be condemned for having taken advantage of the Nation's necessities to secure inordinate profits it cannot be charged with having misrepresented the facts to the Government's representatives.

■ The profits to which Bethlehem claims to be entitled amount to approximately 20% of the cost of the ships which it constructed. These profits are undoubtedly very large, especially when it is considered that Bethlehem took no risk, and it can hardly be denied that Bethlehem took advantage of the war emergency to drive a hard bargain with the Government. The Government contends that these profits are so exorbitant and unconscionable as to render the contracts unenforceable, at least to the extent of the bonuses for savings. Hume v. United States, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393, is relied upon in support of this contention. It appears that in that case, apparently through an error in not substituting "hundredweight" for "pound" in a Government contract, the Government agreed to pay a price for certain supplies which was 35 times their highest and 100 times their lowest market value. The Supreme Court held that the contract was so extortionate and unconscionable on its face as to raise the presumption of fraud in its inception and denied recovery for more than the fair market value of the supplies. The court referred to the language of Lord Hardwicke in Earl of Chesterfield v. Janssen, 2 Ves. Sen. 125, 155, 28 Eng. Reprint 82, referring to fraud of this type: "2. It may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other; which are unequitable and unconscientious bargains; and of such even the common law has taken notice."

There is, however, evidence in the present case that the cost (including the bonus for savings) of the ships built by Bethlehem was no more than many other ships built for the Government at that time on both lump sums and cost plus contracts. In the light of that evidence it can hardly be said that the Fleet Corporation was under any delusion when it made the contracts involved in this case. Consequently they cannot be held to be so unconscionable and extortionate as to be unenforceable under the rule of Earl of Chesterfield v. Janssen and Hume v. United States, supra. It should in fairness be said that the profits derived by Bethlehem from these contracts have been considered only in relation to the actual cost of the ships. It must be recalled, as the special master pointed out in his report, "that Bethlehem was an old line shipbuilding company, carrying the burdens of idle invested capital over long-time periods, the maintenance of an experienced and expensive organization, which, during periods of inactivity in the shipbuilding industry, probably was not productive of overhead, such as maintenance, taxes and other carrying charges. All of these, however, were charges incident to the standby service rendered by Bethlehem, to enable it to perform active service when the needs of the Government might require it. It may well be, as Bethlehem contends, that these factors must have been taken into consideration by the representatives of the Fleet Corporation in their determination that, regardless of the opportunity which the contracts would afford to Bethlehem for substantial profits, it was worth the extra cost, if any, to the Government to place the contracts with an old line company and to insure the continuous service of Bethlehem so long as the war needs might call for it."

■ The Government strongly urges that Bethlehem has not performed the obligation upon which its right to the bonus for savings depends and hence is not entitled to the additional bonus which the district court has awarded to it but should be required to repay the bonus already paid it. Its argument is based upon the premise that the bonus for savings was limited in its application to savings resulting from increased efficiency. We think that the premise is without foundation in the record and the argument consequently falls. There is nothing in the contracts themselves to indicate that savings resulting from increased efficiency alone were intended to be compensated for. The evidence fully supports the master's finding that "Bethlehem was to participate in savings however earned, but expected to produce savings by increased efficiency." It must be concluded that the contracts were entire and that the

bonus for savings formed part of the consideration for Bethlehem's obligation to build the ships. The ships having been built, Bethlehem is entitled to the consideration agreed upon unless, as is urged by the Government, the provisions for a bonus for savings were against public policy and, therefore, invalid and unenforceable. We do not so regard them.

On the contrary it appears to us that this form of contract was a desirable one from the standpoint of both the Government and the shipbuilder. It was preferable to a "lump sum" contract since under the conditions of uncertainty then existing a lump sum price would necessarily have to be determined upon a basis sufficiently high to protect the shipbuilder against all possible increases in cost. The form of contract here used was likewise preferable to an ordinary "cost plus" contract since it provided an incentive to the shipbuilder both to keep down cost and to expedite the work. We agree with the Circuit Court of Appeals for the Sixth Circuit, which in Dayton Airplane Co. v. United States, 21 F.2d 673, had a similar contract before it, that this form of contract was a proper one and not against public policy and that the bonus for savings provision which formed part of the consideration for Bethlehem's agreement to build the ships may not, alone of all the provisions in the contract, be set aside as unenforceable and void. We need only add that the record contains some evidence tending to show that the savings resulted, in part at least, from increased efficiency.

One other point raised by the Fleet Corporation in its appeal in the action at law must be considered. The court below awarded the compensation of the referee as costs in that action alone. The Fleet Corporation argues that his compensation should have been divided between the action at law and the suit in equity. We think, however, that the disposition of this matter by the district court was within its discretionary power and that under the circumstances of this case an abuse of discretion has not been shown.

This brings us to the consideration of the appeal of Bethlehem from the action of the court in refusing to award it interest for any period prior to judgment upon its claim in the action at law. The determination of this question requires a consideration of the nature of Bethlehem's claim. Was it merely an action brought upon the contracts to recover the balance of the price stipulated in the contracts, as Bethlehem argues, or was it essentially an action to recover damages for a breach of the contracts, as the Fleet Corporation urges.

Each of the contracts provided in Article XIX that: "On the completion, a complete audit of the total of the cost of said vessel or vessels shall be made together with a determination of the revised estimated cost as hereinbefore provided, and thereupon the balance of said fixed sum for profit and any additional profit over and above said * * * [fixed sum] determined as hereinbefore provided shall become immediately due and payable." Article XVII of each of the contracts provided that the actual cost of the vessels should be determined, inter alia, as follows:

"For the purposes of this contract, actual cost of the construction of the vessels shall include the following, and items similar thereto in principle:

"(a) * * *

"(b) A proper proportion of running expenses, including ordinary rentals, cost of ordinary repairs, and maintenance, * * *

"(c) A proper proportion of interest accrued within the taxable year on bonds or other debts * * * of which shall be used, or shall have been or shall be invested in plant, equipment, etc., that shall be used, in the performance of the work under this contract.

"(d) * * *

"(e) A proper proportion of physical losses actually sustained within the taxable year in connection with the construction of the vessels under this contract, including losses from fire, flood, * * *

"(f) A reasonable allowance, according to the condition, for depreciation of values of the property and plant of the Contractor used in connection with the work under this Contract. * * *"

An audit was completed about September 1, 1922. Bethlehem argues that it was entitled to interest from the date of this audit. The record discloses, however, that the determination of a "proper proportion" of and a "reasonable allowance" for many of the items making up actual cost was in dispute between Bethlehem and the Fleet Corporation and that the audit did not and could not settle these disputes. Questions of propriety and reasonableness obviously cannot be determined by the

308

mathematical computations of accountants, but, if they cannot be agreed upon by the parties involved, may only be settled by the exercise of the judicial function. It follows, we think, that Bethlehem's claim was neither certain nor capable of being made certain prior to its adjudication by the district court. Bethlehem's suit must, therefore, be classified as an action seeking the liquidation of damages for the breach of a contract rather than a suit brought upon a contract for a sum certain due thereunder.

The view which we take of the nature of the action renders it unnecessary for us to decide the interesting question as to whether the place of performance was Pennsylvania, in which state the checks in payment were to be received by Bethlehem, or the District of Columbia, where the checks were to be mailed by the Fleet Corporation. This is for the reason that under the law of both jurisdictions the allowance of interest prior to judgment was discretionary with the district court. The law of the District of Columbia upon this question is embodied in Section 8, Title 17 of the District of Columbia Code, which is in part as follows: "8. *Interest on judgments for damages.*—In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only; but nothing herein shall forbid the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. * * *"

Likewise it is well settled in Pennsylvania that in an action to recover unascertained damages for a breach of contract the allowance of interest prior to judgment is discretionary. Williams v. Craig, 1 Dall., Pa., 313, 1 L.Ed. 153; Richards v. Citizens' Nat. Gas. Co., 130 Pa. 37, 18 A. 600; Crawford's Estate, 313 Pa. 127, 169 A. 438; McDermott v. McDermott, 130 Pa.Super. 127, 196 A. 889.

It will be seen that both jurisdictions are in line with the modern rule that the allowance of interest in a case such as this should be governed by equitable principles. Board of Com'rs v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 84 L.Ed. 313. This rule is well expressed in the Restatement of the Law of Contracts, § 337, as follows:

"If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows:

"(a) Where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, after making all the deductions to which the defendant may be entitled.

"(b) Where the contract that is broken is of a kind not specified in Clause (a), interest may be allowed in the discretion of the court, if justice requires it, on the amount that would have been just compensation if it had been paid when performance was due."

Under the circumstances of this case we are entirely clear that justice does not require the allowance of interest and that the district court properly exercised its discretion in refusing to make such an allowance.

The decree in the suit in equity and the judgment in the action at law are both affirmed.