## LOHMANN et al. v. HOOPER.
### No. 2790.

Court of Civil Appeals of Texas. Beaumont. Nov. 6, 1935.

Rehearing Denied Nov. 13, 1935.

Lipscomb & Lipscomb, of Beaumont, for appellants.

O. I. Baker, of Port Arthur, for appellee.

WALKER, Chief Justice.

In 1931, appellee, Thomas E. Hooper, was employed by appellants, Henry and Ed F. Lohmann, who owned and operated the Home Laundry in Port Arthur, to solicit and deliver for them laundry, furnishing him for that purpose a laundry truck. This contract was in writing and contained, among other provisions, the following conditions:

"The said party of the second part also agrees that he will not at any time while he is in the employ of the said party of the first part, or within two years after leaving their service for himself or any other person, persons or company, call for and deliver laundered and unlaundered goods, or cleaning and pressing, to any person or persons who shall have been customers of said party of the first part, and supplied by said party of the second part during any time he may have been employed under this contract, 'nor will he in any way, directly or indirectly, solicit, divert, take away or attempt to solicit, divert or take away any of the customers, business or patronage of such customers within two years, and said party of the second part further agrees that he will not at any time while he is in the employ of the said party of the first part, or within two years after leaving their service, for himself or any other person, persons or company, engage in the laundry business, or call for and deliver any laundered or unlaundered, goods, or cleaning and pressing, either directly or indirectly, in that portion of the City of Port Arthur, Tex. situated and bounded on the North by Zwolle Blvd., on the East by Stilwell Bvd., exclusive on the South by Sabine-Neches Canal, on the West by Shreveport Ave., Inclusive. This territory being what is now termed Routes #5 & 6. (said portion of the city containing the laundry route or territory especially entrusted by said party of the first part to party of the second part.)

"The privileges and benefits of this contract shall extend to the successors and assigns of the party of the first part.

"The term of service may be terminated on any day of any month by either party hereto giving the other not less than one week's notice."

On the twenty-second day of September, 1934, appellee voluntarily left the service of appellants and as an independent operator opened an office, printed laundry lists, bought a truck and proceeded to solicit laundry in the territory allotted to him by appellants, as described in his written contract, in direct violation of his written contract. This suit was by appellants against appellee, to enjoin him from soliciting laundry in the prohibited territory for two years from the twenty-second day of September, 1934. A temporary injunction was issued, as prayed for, and upon trial to a jury upon the merits was dissolved.

Appellee's answer raised the issue of equitable estoppel. That is, he pleaded that before leaving the employment of appellants he advised them fully of his plans and of the expense he expected to incur, and that if he left them he would operate an independent business in the prohibited territory; that appellants acquiesced in his plans and agreed that he could operate an independent business; that, relying on the acquiescence of appellants, he incurred the expense of opening an office, printing laundry lists, and buying a truck, and if denied this right he would suffer great financial loss; that he would not have incurred this expense and would not have left the service of appellants but for the fact that he thought he had their consent to operate an independent business within the prohibited territory.

Appellee concedes that the only issue in this case is that of equitable estoppel, which was sent to the jury by the following questions, answered, as indicated:

"Special Issue No. 1. Did Ed F. Lohmann by his acts, representations, conduct or silence lead the defendant, Thomas E. Hooper, to believe that the Home Laundry would not insist upon performance of the contract after September 22, 1934?"

Answer: "Yes."

"Special Issue No. 2. Would the acts, representations, conduct or silence of Ed F. Lohmann, if any, lead a reasonably prudent person to believe that the plaintiff, Ed. F. Lohmann, would not insist upon a performance of said contract?"

Answer: "Yes."

"Special Issue No. 3. Did Thomas E. Hooper, in entering into business believe and rely upon such acts, representations, conduct or silence of Ed. F. Lohmann that he would not insist upon perform-

ance of said contract after September 22, 1934?"

Answer: "Yes."

"Special Issue No. 4. Did Thomas E. Hooper invest money in the business known as Personal Laundry Service after giving Ed. F. Lohmann notice that he was leaving the employment of the Home Laundry?"

Answer: "Yes."

"Special Issue No. 5. Would the enforcement of the contract at this time result in a financial loss to the defendant Thomas E. Hooper, in the investment he has made since Sept. 16, 1934."

Answer: "Yes."

"Special Issue No. 6. Did Ed. F. Lohmann know at the time of his acts, representations, conduct or silence which led Thomas E. Hooper to believe that he would not insist upon the performance of said contract that the operation of a business by Thomas E. Hooper in the same territory would result in a loss of business to the Home Laundry?"

Answer: "Yes."

On the verdict of the jury, judgment was entered in favor of appellee and against appellants' prayer for injunction.

The following quotations from appellee's testimony sufficiently support the jury's answers to the questions submitted; questions and answers reduced to narrative:

"I had a conversation with Mr. Lohmann on or about the 16th day of September, 1934, at the Home Laundry; in the office; that was in the morning; Sunday morning. I went to Mr. Lohmann and told him I was leaving the Home Laundry, that I was dissatisfied with the wages I was getting, that I wasn't making enough to live on, that I couldn't pay my bills, that I had quite an expense, that I had to help contribute to my father's support—he is seventy-three (73) years old, and unable to work—then I have an older brother in very bad health—I told him I couldn't make a living with the wages I was getting, and since business had picked up quite a bit in the last year and a half I thought I was entitled to an increase in wages, and I asked him if my work had been satisfactory, and he said it had, but he says—'if you are dissatisfied and you think you can do better some where else I don't blame you' —you should make a change. He says— 'it will be for your benefit as well as

mine'. He says—I would like to see you do it—he says—'I wish you well',—and that was about all. * * *

"I told him my plans. I told him I wanted to get loose as soon as possible, but I was willing to stay as long as he thought it was necessary for me to stay—as long as he needed me—I wouldn't leave him in a 'jam', but I wanted to get away as soon as possible.

"I told him I was going to solicit business and conduct a business in the same territory I had been working for him. I told him I intended to work the same territory—that I had a lot of friends there, and I intended to solicit business among my friends—it would be impossible for me to make a living among strangers, and I had to make a living. He made no objection whatever. He made no statement relative to it not being agreeable to him. If Mr. Lohmann had raised an objection or told me he would interfere with me I would not have gone into the business. * * *

"When I told Mr. Lohmann that I intended to work the same territory he didn't raise any objection whatever. * * *

"I did not tell Mr. Lohmann that I thought the contract was no good because he didn't live up to it. I didn't tell him anything. It was not mentioned at any time. I talked to Mr. Barras about going into business again. I told him what I was going to do. I told him I had just had a talk with Mr. Lohmann and had turned in my resignation, and that I was going into business for myself. I also told him when I left the Home Laundry I hoped I would have his friendship and good will; that they had mine. I never asked Mr. Lohmann to let me work the entire city at any time while in his employment. When I left the Home Laundry and talked to Mr. Barras I asked Mr. Barras if he thought Mr. Lohmann would be willing to do my laundry work for me, and he said he didn't know—the contract wasn't mentioned. Mr. Barras didn't ask me had I signed a contract, or words to that effect. * * *

"I made up my mind to do something else back in August; I had made up my mind to leave there. I was trying to get arrangements made to where I could leave the Home Laundry. I didn't have any

idea in the world he (Lohmann) would insist on the terms of this contract. He hadn't in the past, and there had been a number of employees quit. He didn't make the least protest whatever. That is what I relied on. The only reason I violated this contract and went into this old territory is not because Mr. Lohmann had never before gotten an injunction against a former employee; that's not the only reason; because when we talked about me leaving the Home Laundry he told me he thought I was doing the right thing; because I was dissatisfied. He told me it would be better for me to leave and do something else; he didn't say what. He said he knew I was dissatisfied; and we parted friends, at least I thought so. I told him at that time that I was going in the old territory. He didn't raise any protest whatever. I don't know whether this contract is valuable from Mr. Lohmann's standpoint. I know it naturally takes some time to train a solicitor in this territory; he gets an advantage by being in daily contact with the customers; he has a chance to learn them, yes. He learns the manner in which the laundry company does business in dealing with its customers. If the laundry company could put a new man on the old route and the old man would go off the route,—well a new man can't do as well as an old man on the route. I do not think it would be an advantage to the laundry company if the old man just stepped out, instead of going back into the old territory and soliciting the same old customers. * * *

"Q. Do you think Mr. Lohmann intended to cheat you when he failed to warn you to keep out of that territory? A. I sure do.

"Q. You sure do? A. Yes, sir.

"Q. Do you think he got any advantage over you when he failed to open his mouth and protest? A. Yes, sir.

"Q. What advantage did he get? A. Well, it looks to me like he wanted me to go ahead and invest my money in the business—get started—and lead me to believe it would be all right—then cause me to lose my money—freeze me out.

"Q. Do you think it was Mr. Lohmann's idea to spend two (2) or three (3) days in court, employ attorneys and make bond and do all those things to injure you,

when by a simple protest at that time— A. I hadn't thought of that.

"Q. But having thought of that, do you think Mr. Lohmann wanted to do you an injury? A. Yes, sir.

"Q. Do you think he had any advantage over you? A. Yes, sir.

"Q. What was it? A. If he had told me he was going to enforce this contract I wouldn't have bought any automobile and gone to this other expense—

"Q. I heard you say all that. Did he get any profit of any sort by the reason that you quit him down there and went into business in the old territory? A. Well, if he froze me out—

"Q. You are arguing with me. You are not answering my question. I asked you this. Did he get any benefit from his failure to object to your going into that territory?

"By Mr. Baker: Now, Your Honor, we want to object to that. I don't think this witness is qualified to testify about all the benefits that accrued to Mr. Lohmann, if any.

"By the Court: Objection overruled.

"By Mr. Baker: Note our exception.

"By the Witness: I can't answer that, question."

The witness Barras, referred to by appellee in his testimony, was the superintendent of appellants' laundry and had been in their employment for twenty-six years; he testified further that appellee told him that he was going to quit; that he had made arrangements for a truck and to get an office and was going to operate a personal business; "we talked for a good while in regard to what he would do, and he said then—'I know Mr. Lohmann is going to try to get an injunction against me, but I know no Court will uphold it.'" Appellee denied making that statement. However, Mr. Barras testified that after appellee made that statement, he, Mr. Barras, said: "No; I don't think he will try to keep a man from making an honest living."

The facts brought forward from the record bring this case within the principle of estoppel announced by the Supreme Court of the United States in Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618, where it is said: "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done,

shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden." See, also, Union Mut. Life Ins. Co. v. Mowry, 96 U.S. 544, 24 L.Ed. 674; Lockhart State Bank v. Baker (Tex.Civ.App.) 264 S.W. 566.

There is no merit in appellants' contention that the issue of estoppel is not in the case because appellants failed to state affirmatively to appellee that he had their consent to operate an independent business. On the facts stated by appellee, it was not necessary for Mr. Lohmann to give an affirmative answer; by his silence he misled appellee as completely as if he had agreed to his proposed plan to operate an independent business. In 21 C. J. 1120, par. 124, it is said: "It is an essential element of an equitable estoppel that the acts, representations, or silence relied on to create the estoppel must have been willfully intended to lead the party setting up the estoppel to act upon them, or there must have been reasonable grounds to anticipate that he would change his position or in some way act on the faith or the conduct to his detriment."

The following proposition of law announced by the court in Ross v. Isaacs (Tex.Civ.App.) 54 S.W.(2d) 182, 184:

"A consideration to create the equitable estoppel pleaded and shown was not necessary. Dickerson v. Colgrove, 100 U.S. 578, 25 L.Ed. 618.

"The rule as announced by the authorities cited does not rest on the assumption that the promisor has obtained any personal gain or advantage, but on the fact that he has induced others to act in such a manner that they will be seriously prejudiced if he is allowed to fail in carrying out what he has encouraged such others to expect,"

—denies appellants' proposition that it was necessary for appellee to plead and prove a consideration for the estoppel, moving from him to appellants.

We agree with the argument of appellants that, where the issue is simply one of equitable estoppel, the jury, the lower court, and the appellate court, should weigh with great care the evidence offered to support the plea; if this testimony comes from a suspicious source or suggests fraud or deceit, a jury's verdict in favor of estoppel should be set aside. We do not find any impeaching circumstance in this record. Appellee and Mr. Lohmann were the only witnesses to the conversation between them; appellee gave one version, that stated above in our summary of his testimony. This statement was flatly denied by Mr. Lohmann; however, he did not deny that in the past he had permitted other employees of his laundry, in violation of their written contracts, to solicit laundry for other employers. Then there was the statement by appellants' general manager, Mr. Barras, who had been acquainted with their method of operating business for twenty-six years, that, in his judgment, appellants would not enjoin appellee from operating his independent business. After a careful review of all the authorities cited by appellants on the weight of the testimony in this case, we cannot escape the conclusion that the issue was for the jury.

All of appellants' assignments and propositions are overruled, and the judgment of the lower court is in all things affirmed.