## SAMMONS v. HODGES.
### No. 4616.

Court of Civil Appeals of Texas. Amarillo.

June 8, 1936.

G. V. Pardue and McWhorter & Howard, all of Lubbock, for appellant.

Bean & Bean, of Lubbock, for appellee.

HALL, Chief Justice.

This suit was filed and tried in the justice court of Lubbock county, resulting in a judgment against Sammons, and upon appeal to the county court was tried again, where written pleadings were substituted for the oral pleadings upon which the case was tried in justice court.

Hodges alleged that he was the owner of a certain building in Lubbock, which had been leased to the Post Office Department for the sum of $50 per month; that appellant, together with other subscribers, agreed in writing to pay each a sufficient amount, named in the contract, necessary to increase the rent of the building to $125 per month. The contract is dated June 18, 1926, and contains the following material stipulations: "For the purpose of securing more space at the postoffice for the easy dispatch of business there, and in consideration of J. A. Hodges, owner of the postoffice building, giving such space by letting the postoffice rooms extend to the front of the building, occupying the space now occupied by the Postoffice Drug Store, we, the undersigned persons interested in the matter, and for the purpose of aiding J. A. Hodges in the matter of revenue on his building (he having to lease that part of said building above mentioned for $50.00 to the Government), we each of us agree and promise to pay on the first day of each month after the postoffice has secured the additional space above mentioned to J. A. Hodges, for and in consideration of the matters above set out, the amounts set opposite our names. It is understood and agreed that these payments will continue for a period of ten years unless the postoffice should sooner be removed from said office or unless the revenue from said postoffice rentals paid to J. A. Hodges increase to such a point as to make this contribution unnecessary in order for him to secure the $125.00 rent for the space now occupied by the said drug store."

This was executed by Sammons, the appellant, with eight other subscribers, six of them agreeing to pay $5 per month, and the remainder $2.50 per month.

Plaintiff further alleged that the United States post office did thereafter use the additional space (previously occupied by the drug store), and paid $50 per month until June, 1932, when the building was abandoned; that, after the additional space was acquired, the rent did not increase and plaintiff did not receive additional rentals, leaving a balance of $75 per month due him by the defendant and the other parties during the time the post office remained in said building. The suit was for $127.50, being $5 per month, the amount subscribed by defendant, for the time not barred by the statute of limitations at the time the suit was filed. In other words, he sued for $5 a month from May 1, 1930, to June 15, 1932.

The defendant answered by general demurrer, special exceptions for lack of necessary parties, a general denial, and, among others which are immaterial here, the following special defenses:

"1. That at the time the contract was signed plaintiff had other outstanding contracts of a like nature with other citizens of the town, which contracts called for guaranties on the part of other citizens named therein; that said contracts were of a like nature and for a like purpose; that the contract sued on was ambiguous; that it was contemplated by the execution of said contract that plaintiff would only receive the sum of $125.00 from all sources, including all contracts with other citizens, and including the rent of $50.00 per month paid by the Federal Government for that part of the building occupied as a postoffice in the rear of the building. It was further contemplated that in the event he did receive $125.00 from all sources, defendant would not be liable for any sum; that in the event there were more signers in dollars and cents than necessary to make up the $125.00, or the difference between the $50.00 paid by the Federal Government and the $125.00, that defendant's liability would be reduced in proportion; that plaintiff did receive enforceable obligations and guaranties far in excess of the sum of $125.00 per month, which had the effect of reducing defendant's liability and obligation; that the plaintiff received enforceable contracts and rentals far more than sufficient to extinguish defendant's liability, if any.

736

"2. Defendant further alleged that the contract sued on was abandoned and superseded by another contract entered into between plaintiff and other parties; that such contract was mutually abandoned by plaintiff and the defendant; that after the signing of the contract in question, plaintiff entered into a new arrangement with the Federal Government, and plaintiff asked defendant to sign a new agreement, which defendant refused to do; that plaintiff acquiesced therein and said contract was mutually abandoned.

"3. Defendant further alleged that more than two years had elapsed since defendant notified plaintiff that he no longer would be bound by said contract; likewise, four years had elapsed; and said statutes of limitations of two and four years were set up as a defense."

"6. That for more than eight years, plaintiff made no demand whatever on him for payment on said contract, and was thereby estopped to claim thereunder against defendant."

"8. Defendant further pleaded that the contract was against public policy, and therefore void."

The case was submitted to a jury upon the following special issues:

"1. Do you find, from a preponderance of the evidence, that the defendant, Sammons, is indebted in any sum to plaintiff, J. A. Hodges, by reason of the agreement sued on and introduced in evidence in this case from May 1, 1930 to June 15, 1932?" The jury answered: "Yes."

"2. What sum of money, if any, do you find from a preponderance of the evidence defendant, Sammons, is indebted to plaintiff Hodges by reason of the agreement sued on?" Answer: "$127.50."

The court then rendered judgment in favor of Hodges against the defendant, Sammons, for said sum, with interest.

By his first proposition, the appellant insists that the trial court erred in refusing to give the defendant's requested first special issue as follows: "Do you find from a preponderance of the evidence that the plaintiff abandoned the contract sued upon?" for the reason, as appellant insists, that the defendant was entitled to have the court submit his affirmative defense that the contract sued on was in fact abandoned by the plaintiff.

By the second proposition, it is insisted that the court erred in refusing to give defendant's second special issue as follows: "Do you find from a preponderance of the evidence that the defendant waived the payments as called for in the contract sued on as they matured?"

It is our opinion that the testimony did not raise the issues of abandonment and waiver of the contract. Sammons testified briefly, saying that Hodges had never at any time prior to the institution of the suit demanded payment of him, and that he saw him frequently. He did not testify that he ever offered or refused to pay the amount due under the contract for any month prior to the time the suit was filed. The contract had been in existence for eight years after its execution before the filing of the suit. Sammons did not testify that Hodges, by any agreement with him, ever expressed an intention of abandoning the contract. The law with reference to the abandonment of a contract is that such abandonment will not be inferred from long delay of performance by one of the parties thereto when such delay is sufficiently accounted for, nor will his rights be treated as a stale demand when the delay is satisfactorily explained. Urquhart v. Ury, 27 Tex. 7. The only explanation of why Hodges made no personal demand upon Sammons, as shown by the statement of facts, is in substance as follows: That he never, at any time until sixteen days before this suit was filed (a year before it was tried), made any demand upon Mr. Sammons personally. He said, however, "We had collectors out trying to collect it." That he never wrote Sammons personally about it, but that the collectors wrote him six months or a year prior to the filing of the suit, demanding payment.

On re-examination, he was asked why he made no effort to collect the amount due under the contract from Sammons for about eight years. He said: "Well, from the time the postoffice was there in 1924 up to 1929 we were all, you and I and everybody else, in our heyday. We had money until the world looked level, and didn't have time for collections unless we just by chance thought of it at the time. I know I had plenty of business and figured everybody else had plenty of business, but along in 1929 or '30 things got to be awfully bad. I know my business fell off and I presumed everybody else's business had fallen off. I didn't have the nerve to go out and ask anyone for money, and later on business got a little better and I began to need

money myself worse, and I thought I had better try to collect off of them whatever they promised to pay. They have not paid; therefore, I sued them. Under the terms of the contract it was to run for ten years."

We agree with the jury that this explanation of the delay was satisfactory.

On cross-examination this evidence was elicited:

"Q. You stated that for two or three or four years you did not have the nerve to ask these people to pay? A. Correct you are.

"Q. You filed this suit in the spring of 1934, didn't you? In May, 1934, if I get it right, and that when you began to need the money so bad? A. Yes, sir.

"Q. After a lapse of eight years from the time the first payment was due you decided to make the boys pay if you could? A. Well, 1933 was a pretty good year for most of us, and 1934 was pretty rotten, if you remember."

He then stated that, although the President closed up the banks in the United States, he did not close up the farms; that he could always draw a check any time he wanted to, and cash it.

"The facts and circumstances may be such as to raise a presumption of abandonment, but the circumstances must be very strong to warrant such a presumption. Intent to abandon can hardly be presumed from lapse of time. * * * The burden of showing an abandonment rests upon the one who asserts it." 1 C.J. p. 11, § 17.

In Mood v. Methodist Episcopal Church, South (Tex.Civ.App.) 289 S.W. 461, 464, the court said: "To constitute abandonment of contract by conduct, the acts relied on must be positive, unequivocal, and inconsistent with the existence of the contract."

In Southern Travelers' Ass'n v. Wright (Tex.Com.App.) 34 S.W.(2d) 823, 826, Judge Sharp said that in construing a contract the parties' intention controls, and "the rule is well settled that to annul or modify a contract, fairly made, requires the consent of both parties, as it did to make it. There must have been the same meeting of minds, the same agreement to modify or abandon it, that was necessary to make it. Wheeler v. New Brunswick & C. R. Co., 115 U.S. 29, 5 S.Ct. 1061, 1160, 29 L.Ed. 341."

As stated, the contract which forms the basis of this suit covered a period of ten years, or until the building should be abandoned by authority of the Post Office Department. This occurred in June, 1932. This suit was filed June 12, 1934, and seeks to recover payments due within the four years immediately preceding the filing of the suit.

In 67 C.J. 288, "waiver" is thus defined: "To relinquish intentionally a known right, or intentionally to do an act inconsistent with claiming it, to relinquish voluntarily a right which one may enforce if he chooses, to renounce, to repudiate or to surrender a claim, privilege or right. Use of the term implies the abandonment of a right which can be enforced, or of a privilege which can be exercised, and a person is said to waive a benefit when he renounces or disclaims it."

And on page 306 it is said: "A waiver may be implied from the silence of the party who has the power of waiving, under circumstances which require him to speak. Such silence, it has been said, must be a deceptive silence, accompanied by an intention to defraud which amounts to a positive beguilement. However, mere silence, when one is not bound to speak, when there is no occasion to speak, especially where such silence is unaccompanied by any act calculated to mislead, in the absence of conduct amounting to an estoppel, will not constitute a waiver. To hold that one, by his silence, may relinquish contractual rights in consequence of facts of which he is justifiably ignorant would be to judicially disregard the obligations of the contract without his assent, express or implied."

Under a plain construction of the contract, construed in the light of the uncontradicted testimony of Hodges, he had the right to collect from the subscribers the amount subscribed by each, to the extent of $75 per month, during the ten years. The fact that he did not need the money during that period, and was indulgent and generous toward the subscribers, is no evidence whatever of an intention on his part to abandon his rights under the contract.

By the third proposition it is insisted that the court submitted a mixed question of law and fact to the jury. This objection is overruled.

Nor do we think that the contract was in violation of public policy. The consideration moving to the subscribers was the fact that the location of the post office, a much-frequented place of busi-

ness, could be kept at its then location, which the record shows was close to the places of business owned by each of the subscribers. The money which the subscribers promised to pay Hodges, the owner of the building, does not come within the inhibition insisted upon by appellant. If the money had been promised to an official of the United States government who was charged with the location of the post office, and for the purpose of influencing him to keep the post office at its then location, the contract could have been subject to the objections urged, but it was not shown that it was intended that any official of the Post Office Department should receive any of the money promised ·by the subscribers.

In 13 C.J. p. 437, § 373, it is said: "Where individual contributions to secure the location of a public building, or the construction of a public improvement, inure to the benefit of the public, and are not given to any official for the purpose of influencing his judgment, or to an individual to influence the judgment of an official charged with the public duty, and do not tend to affect the exercise of the judgment of an official contrary to the public interest, they are not against public policy."

No reversible error is shown, and the judgment is affirmed.