**GOVERNMENT PERSONNEL MUT. LIFE INS. CO. v. WEAR.**

No. 12290.

Court of Civil Appeals of Texas. San Antonio.

Feb. 6, 1952.

Rehearing Denied March 5, 1952.

Hubert W. Green, Frank M. Rosson, San Antonio, for appellant.

Trueheart, McMillan & Russell and Wier & Wier, all of San Antonio, for appellee.

### W. O. MURRAY, Chief Justice.

This is an appeal by Government Personnel Mutual Life Insurance Company, hereinafter referred to as appellant or as Insurance Company, from a judgment awarding to Gordon Wear a recovery in the sum of $68,630.79 for override commissions on certain insurance, and the further sum of $5,000 as attorney's fees. The judgment also has declaratory features as to future commissions on renewals of policies. The trial was to a jury, but the court disregarded such answers of the jury as were favorable to the Insurance Company and rendered the above judgment, notwithstanding such jury answers. The Insurance Company has prosecuted this appeal.

The above judgment was based upon appellee Wear's claim to override commissions upon insurance policies written by the Insurance Company and solicited by one C. H. Earl and twenty-five of his so-called sub-agents.

Wear's right to recover these commissions depends upon the interpretation to be placed upon three contracts executed on July 1, 1946. For the purpose of designating these contracts we will call them contracts Numbers 1, 2 and 3. Contract No. 1 was between Wear and the Insurance Company and had the effect of appointing Wear a solicitating agent of the Insurance Company and authorizing him to solicit insurance policies for the Insurance Company, for which he was to be paid certain stipulated commissions. Contract No. 3 was a somewhat similar soliciting agency contract appointing C. H. Earl a soliciting agent and authorizing him to solicit insurance for the Insurance Company, for which he was to receive certain commissions.

This entire controversy arises under the terms of Contract No. 2. This contract was styled "Supplemental Agreement" and provided in part as follows: "The company agrees to pay Gordon Wear the following commission on (premiums paid for) life insurance contracts issued by said company on insurance written (solicited) by C. H. Earl under his contract dated July 1, 1946." (The parties agree that the inserted words were intended.) Then follows the schedule of percentages to be paid to Wear on the various kinds of life insurance policies to be solicited by Earl.

The first question to be decided is upon what date this Contract No. 2 was terminated. The Insurance Company contends that it was terminated on January 1, 1948, by oral notice given by P. J. Hennessey, Vice-President and General Manager of the Insurance Company to Wear in October, 1947. Wear contends that Contract No. 2 was not terminated until thirty days after written notice of termination or cancellation was given to him on May 28, 1948.

There was no provision within the four corners of Contract No. 2 for written notice of termination, but such a provision is found in Contract No. 1. Appellee, Wear, contends that these two contracts, being executed between the same parties on the same date and relating to the same subject matter and Contract No. 2 being styled "Supplemental Agreement," should be read and construed together as one contract, and that when this is done paragraph X of Contract No. 1 became a part of Contract No. 2, and that this paragraph provides for termination only upon thirty days' written notice.

We are well aware of the general rule contended for by Wear. It is well stated in 10 Tex.Jur. § 166, Contracts, p. 286, as follows: "All written instruments whereby a single transaction is consummated are to be taken and construed together. So, in-

struments executed at the same time or contemporaneously, for the same purpose, and in the course of the same transaction, are to be considered as one instrument, and are to be read and construed together; and in such case parol evidence is admissible to connect the instruments and to explain any conflict between them." The authorities are so numerous upon this general proposition that we do not deem it necessary to cite them here.

Appellant, Insurance Company, contends that these two contracts were not executed for the same purpose but had very different purposes; that Contract No. 1 was executed for the purpose of appointing Wear a soliciting agent for the Insurance Company and Contract No. 2 was executed for the purpose of giving Wear, as a general agent of the Insurance Company, override commissions on insurance solicited by Earl under his contract of even date, being Contract No. 3.

Contracts Nos. 1 and 2 do not expressly refer to each other or expressly make one a part of the other. The only thing that might be so construed is the fact that Contract No. 2 is styled "Supplemental Agreement"; also, it might be mentioned that Contract No. 1 expressly provides in paragraph XVI thereof that: "this agreement, together with any amendments thereto duly executed constitutes the entire contract between the parties." This last provision was a stereotyped provision found in all of the soliciting agency contracts executed by the Insurance Company.

We may assume without deciding that Contracts Nos. 1 and 2 should be construed together as one contract for the purpose of determining the intention of the parties. This brings us to the question of what is meant by the statement that "all written instruments whereby a single transaction is consummated are to be taken and construed together." Does it mean that the several instruments are bodily consolidated into one instrument so that every provision in one instrument becomes a part of every other instrument, or does it mean that such instruments are simply read and considered together so as to arrive at the true intention of the parties in executing the several instruments? We think the latter is correct.

Contract No. 1 and Contract No. 2 are each a complete and separate contract, written on separate pieces of paper and each is signed by the parties. They are not in conflict as to the purpose to be accomplished. The intention of the parties can readily be understood from the language contained within the four corners of each. They mean the same thing, whether you read them separately or together. The only purpose of construing them together is to apply paragraph X in Contract No. 1 to Contract No. 2 and thereby requiring thirty days' written notice of termination of Contract No. 2. This is all that will be accomplished by construing them as one contract. Reading and construing contracts together does not justify bodily taking a paragraph from one contract and transplanting it in the other.

We do not find any Texas case directly in point. In Mechanics' Lumber Co. v. Yates American Mach. Co., 181 Ark. 415, 26 S.W.2d 80, 83, the Court quotes from 6 R.C.L. 852, as follows: "But construing contemporaneous instruments together, means simply that if there be any provisions in one instrument limiting, explaining or otherwise affecting the provisions of another, they will be given effect as between the parties themselves and all persons charged with notice so that the intent of the parties may be carried out and that the whole agreement actually made may be effectuated. This does not mean that the provisions of one instrument are imported bodily into another contrary to the intent of the parties. They may be intended to be separate instruments and to provide for entirely different things." 12 Am.Jur., Contracts, § 246, p. 783, is to the same effect.

In Huyler's v. Ritz-Carlton Restaurant & Hotel Co., D.C., 1 F.2d 491, 492, the rule is stated as follows: "It is true that the principle by which instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are considered as one, and receive the same construction as if embodied in one instrument, is of wide application and the illustrative cases are many.

Elliott on Contracts, § 1522; 6 R.C.L. 851; 13 C.J. 528. But at most that principle is merely a rule of construction to give effect to the intent of the parties. The provisions of one instrument are not thereby imported bodily into another. The application of the rule does not result in actual consolidation of the several contracts. It does not convert a specialty into a simple contract, or a simple contract into a specialty. Each of several instruments may be construed in the light of the others, without their being considered as one for all purposes. Moreover, considering several instruments as one is not the natural construction, and is resorted to only to effectuate the intention. They may be intended to be separate instruments and to provide for different things. Barker v. Sartori, 66 Wash. 260, 264, 119 P. 611; Thorp v. Mindeman, 123 Wis. 149, 101 N.W. 417, 68 L.R.A. 146, 107 Am.St.Rep. 1003, 6 R.C.L. 852. To effectuate the intention of the parties in the case at bar I think that it is not necessary to consider the three instruments as one."

What was said by Chief Justice Fly of this court in Harris v. G. M. H. Wagner & Sons, Tex.Civ.App., 195 S.W. 351, 352, sheds considerable light on this question: "The second contract is separate and distinct from the first, which was a contract for raising, gathering, and marketing the onions on 25 acres of land. The last contract was one of purchase alone of the onions on 15 acres of land. There is no provision for appellees to receive 11 cents a crate, over 12 per cent. of the total value, merely for accepting the onions which they had bought from appellee. In the second contract it is provided: 'This instrument to in no way affect previous contract.' If there was any doubt as to the last contract being independent of the former contract, that provision dispels it. It is a separate and distinct contract, totally different from the former one. It follows that the first contract should not be looked to in construing the second, as none of its provisions have any applicability to the provisions of the last contract. It may be presumed that there were other onions than those on the 15 acres to be marketed, and that the saving clause copied was placed in the contract to show that the brokers still had their rights under the first contract. The provision in the first contract that appellees, at Chicago, 'shall have the privilege of buying from the Texas office upon an f. o. b. basis, upon equal terms with competing organizations or firms,' would not be impaired by not permitting them to retain over 12 per cent. commissions, but, on the other hand, the retaining of that amount would give them an unconscionable advantage over other buyers."

In Canadian Coal Co. v. Lynch, 28 Okl. 585, 115 P. 466, 468, the court said: "The effect of sustaining the contention of plaintiff in error would be to allow it to contradict the terms of one written instrument by another for the purpose of refining away a contract concerning a valid subject of contract between the parties, by merging it into another contemporaneous contract between the same parties concerning a subject they were not authorized to contract about, so that finally all that remains is the invalid contract, which of course would be unenforceable. This would not constitute 'construing contracts together,' as we understand the doctrine."

The fact that Contract No. 2 was styled "Supplemental Agreement" is of little or no importance. It is not a part of the contract, it does not indicate what it supplements. If the parties had styled the instrument a "Will" or a "Warranty Deed" it would not have changed the nature of the instrument. It is much more important what the instrument when read within its four corners provides than the name the parties who were not lawyers gave it. At the time of the trial Contract No. 2 was attached to Contract No. 1, but there is nothing to show when this was done or that it was so intended by the parties. If it was intended that Contract No. 2 was to become a part of Contract No. 1 and be governed and controlled by all of the provisions contained in Contract No. 1, it would have been very easy to have so provided in the instrument. This was not done.

Contract No. 2 contains no provision requiring thirty days' written notice of termination and we see no reason why such

a provision should be lifted up bodily from Contract No. 1 and placed in Contract No. 2, where the instruments fail to show that the parties so intended. There being no provision in Contract No. 2 requiring written notice of termination, it was subject to cancellation at any time by either party and was therefore terminated or cancelled by the oral notice given by Hennessey to Wear in October, 1947.

■ The most that can be said for appellee's contention in this connection is that the evidence raised a question of fact as to the intention of the parties and appellee having failed to request any issue as to the intention of the parties has waived such issue. Rule 279, T.R.C.P.

The provisions of the two contracts state in plain language that the company agrees to pay Wear certain commissions on life insurance contracts issued by the company on life insurance written by C. H. Earl under his contract dated July 1, 1946. Contract No. 3, which is Earl's contract of July 1, 1946, above referred to, provides that Earl is to be paid commission on insurance contracts issued by the company on applications secured and turned in to the company by C. H. Earl and bearing his name as soliciting agent. It becomes necessary to construe Contract No. 2 with Contract No. 3 to determine what was meant in Contract No. 2, when it refers to insurance written by C. H. Earl under his contract dated July 1, 1946. When we examine Contract No. 3 we find that Earl is required to solicit insurance and that he will be paid a commission only upon applications signed by him. This plain language contained in these contracts shows plainly that Wear was to have overriding commissions on insurance secured upon the personal solicitation of C. H. Earl and upon applications signed by him.

■ The testimony of Wear that it was a general custom for soliciting agents to appoint sub-agents can have no weight here, because the parties have plainly stated what they intended and therefore proof of custom is not necessary or proper to construe the contracts. Where the parties have plainly stated within the four corners of the contract what their rights are under such contract general custom plays no part in construing it, because the intention of the parties is to be derived from the language used in the contract when it is clear and unmistakable as to its meaning.

■ There is another reason why Wear cannot collect any override commissions on insurance written after January 1, 1948. Contract No. 2 provided that he was to have certain override commissions on insurance written by Earl under Earl's contract dated July 1, 1946. This language is plain and certainly he was not entitled to override commissions written under any other contracts. It is similar to a person buying oil royalty under an existing oil and gas lease. He is not entitled to royalty under subsequent or different leases. Keaton v. Murphy, 198 Ark. 799, 131 S.W.2d 625; McWilliams v. Standard Oil Co., 205 Ark. 625, 170 S.W.2d 367; Fleming v. Ashcroft, 141 Tex. 41, 175 S.W.2d 401; Curlee v. Anderson & Patterson, Tex.Civ.App., 235 S.W. 622; Elk Horn Coal Corp. v. Casebolt, 6 Cir., 38 F.2d 37; Rogers v. Jones, 10 Cir., 40 F.2d 333; Leydig v. Commissioner of Internal Revenue, 10 Cir., 43 F.2d 494; Maxwell v. Hunter, 5 Cir., 116 F.2d 260.

The evidence shows conclusively that Earl and the Insurance Company terminated his soliciting agency contract dated July 1, 1946, as of December 31, 1947, and operated under a new contract whereby Earl became the general agent of the Insurance Company. It is true the terms of this contract were not reduced to writing until about May, 1948, and dated back to January 1, 1948, but, nevertheless, the parties had cancelled the old contract and ceased to do business under it by January 1, 1948. Wear was in no way a party to this contract and his consent to its cancellation was not required. When Earl's contract of July 1, 1946, was terminated by the consent of the parties thereto, Wear's rights to override commissions on insurance thereafter written by Earl came to an end.

Question No. 6 submitted to the jury was as follows: "Do you find from a preponderance of the evidence that defendant acted in good faith toward plaintiff, Wear, in the

cancellation effective December 31, 1947, of C. H. Earl's contract of July 1, 1946 (if there was such cancellation)?"

The jury answered this issue "Yes" and this answer is supported by ample evidence. The trial court disregarded this issue upon the theory that it was immaterial. In this he was in error. By the good faith cancellation of Earl's contract of July 1, 1946, all rights of Wear to override commissions on future insurance was brought to a close under the provisions of Contract No. 2.

 Appellant contends that appellee should not have been permitted to recover attorney's fees. Attorney's fees were allowed under the provisions of Art. 2226, Vernon's Ann.Civ.Stats., as amended in 1949. Bellinger v. Schutte, Tex.Civ.App., 244 S.W.2d 261 (writ refused). Appellant points out that appellee's claim arose prior to the effective date of this amendment and therefore the trial court gave retroactive effect to the amendment in violation of Section 16, Article 1, of the State Constitution Vernon's Ann.St. We overrule this contention. A careful reading of Art. 2226 as amended does not require that the claim must have accrued subsequent to the effective date of the amendment, but simply provides in part that a person having a claim against a person or corporation for personal services who presents such claim and it is refused after the effective date may collect attorney's fees. The claim here was presented and refused after the effective date of the 1949 amendment to Art. 2226 and therefore was within its provisions. The claim was for personal services as a general agent of the Insurance Company. It is not contended that the attorney's fees are excessive.

Appellant tendered the sum of $942 to appellee as being due him under his override contract, and the judgment will be amended so as to eliminate the recovery of $68,630.79, and in place thereof provide for a recovery of $980.40, together with interest at the rate of 6% per annum from January 1, 1948, until paid.

Paragraph (6) of the judgment will be amended so as to hereafter read as follows:

(6) That, in addition, defendant, Government Personnel Mutual Life Insurance Company, either now owes or else will owe plaintiff, Gordon Wear, two and one-half (2½%) percent commission on renewal premiums paid or that may later be paid, on each and every twenty-year endowment and twenty-payment life insurance policy, application for which was originally procured by C. H. Earl prior to January 1, 1948, that has been or is later renewed within ten years of its original issuance, if, as and when the premiums have been paid thereon to defendant since December 31, 1949, or are hereafter paid thereon to defendant in the future.

The judgment as reformed is affirmed.

NORVELL, Justice.

I concur with the view of my associates that under a proper construction of the contract or contracts here involved Wear is not entitled to commissions upon insurance written by Earl's sub-agents. This holding, regardless of the views relating to the effective date of the cancellation of Wear's override on business produced by Earl, disposes of the larger part of the money judgment rendered in favor of Wear by the trial court. As to this point there is no disagreement among us.

As to the effective date of the cancellation of Wear's override, I concur in the result reached by the Chief Justice that Wear's right to the override came to an end on January 1, 1948. The contrary view is that this right did not terminate until thirty days after May 28, 1948, when written notice of cancellation was given. Adoption of this contention would mean a difference in the money recovery awarded to Wear of something over four thousand dollars.

However, the question of date of cancellation is basic in this lawsuit and I reach the conclusion that the terms of the contract providing for the override terminated upon January 1, 1948, because under the jury verdict, which I regard as having support in the evidence, Wear was estopped from contending that the override did not end on said date. I believe the contract involved is ambiguous and regard the recent

Supreme Court case of Humble Oil & Refining Company v. Harrison, 1947, 146 Tex. 216, 205 S.W.2d 355, as controlling the disposition of this appeal.

I. The jury, by its answers to Special Issues Nos. 2, 6 and 9, found that the "Supplemental Agreement" had not been cancelled by mutual agreement; that the insurance company had acted in good faith toward Wear in cancelling Earl's contract of July 1, 1946, and fixed an attorney's fee. The remaining issues were answered as follows:

"Question No. 1: Do you find from a preponderance of the evidence that when Peter J. Hennessey in October or November, 1947, orally notified plaintiff, Wear, that the contract of July 1, 1946, between plaintiff and defendant, insofar as it related to overriding commissions, would be cancelled by the defendant effective on January 1, 1948, that plaintiff, Wear, waived the thirty days written notice of cancellation as provided for in said contract? Answer: Yes. * * *

"Question No. 3: Do you find from a preponderance of the evidence that on the occasion when such oral notice of cancellation was given, plaintiff, Wear, knew that defendant intended to increase the commissions of C. H. Earl and other agents effective January 1, 1948, in reliance if he did rely, upon the cancellation, if any, of the contract of July 1, 1946, between plaintiff and defendant. * * * Answer: Yes.

"Question No. 4: Do you find from a preponderance of the evidence, that defendant thereafter did increase the commissions of C. H. Earl and other agents, effect (sic.) January 1, 1948, in the belief that the contract of July 1, 1946, between plaintiff and defendant had been cancelled? Answer: Yes.

"Question No. 5: Do you find from a preponderance of the evidence that but for the belief if any by defendant that the Supplemental Agreement in question had been properly cancelled by oral notice, said defendant would not have increased the commissions to said Earl and other Agents? Answer: Yes. * * *

"Question No. 7: Do you find from a preponderance of the evidence that the plaintiff, Wear, had knowledge that defendant did not intend to pay him after December 31, 1947, override commissions under the Supplemental Contract? Answer: Yes.

"Question No. 8: When do you find from a preponderance of the evidence the plaintiff, Wear, had knowledge that the Defendant did not intend to pay him after December 31, 1947, override commissions under the supplemental contract?

"Answer by stating the day, month and year, if you can; if you cannot, state the month and year. Answer: October, 1947."

With reference to a conversation with Wear in October, 1947, Hennessey, the Vice President of the Company, testified as follows:

"Q State the substance of what was said by each of you in that conversation * * *. A Well, I told Mr. Wear at the time that beginning on January 1, 1948, that we would enter into an agreement with Mr. Earl whereby he would be general agent and that the agreement between the company and Mr. Wear would be terminated and that he would receive no more override on business effective on or after January, 1948, and Mr. Wear's first remark at that time was, 'Well, I have been expecting it for some time.' (From Hennessey's deposition read upon cross-examination.) * * *

"Q Mr. Hennessey, before recess you were testifying concerning your conversation or talks with Mr. Wear in the fall of 1947, with regard to the termination of the supplemental ten per cent override agreement on Mr. Earl's business. At that time did Mr. Wear ask for written notice? A No, nothing was mentioned about written notice; he didn't ask for it, and I didn't give it to him.

"Q Was there time to give him written notice? A Sure. I would have been glad to have given him written notice if he had asked for it. I didn't think it required it. I would have given it; I would have been glad to give it.

"Q Was this period approximately just before January 1st? A More than sixty days before. It was some time during October, 1947, or it may have been towards the end of September. It was more than sixty days before the end of the year.

"Q So, you had time to have given it if he had demanded or requested it, that is thirty days written notice, is that right? A Yes. * * *

"Q Did he object to the oral or verbal notice? A No. * * *

"Q Mr. Hennessey, you have testified that it was along in October, 1947, that you agreed on new commission rates with Mr. Earl, and that those new commission

The evidence and jury findings,[1] to my mind, establish that Hennessey, the Vice President of the Company, told Wear in October, 1947, that that part of the contract

which gave Wear an override on business produced by Earl would terminate on January 1, 1948, because it was advisable in his opinion to increase Earl's commissions, and he did not intend to pay further commissions to Wear upon business produced by Earl. This occurred at least sixty days prior to the effective date of the cancellation. There is no doubt but what a conversation between Wear and Hennessey occurred in which the matter of increasing Earl's commissions and the terminating of Wear's override was discussed. It seems to me immaterial whether the conversation took place before or after Hennessey had entered into a new agreement or an amended agreement with Earl. The company possessed the undoubted right to terminate the override agreement, and at the time the new or amended agreement with Earl was made, the company *could* have cancelled Wear's override by giving written notice, had such been required. Hennessey construed the contract as not requiring a written notice and Wear knew that he was acting upon that construction in making a re-arrangement of the company's agency contracts. Earl's commissions were increased from and after January 1, 1948. Wear remained in the employ of the company until thirty days after May 28, 1948, and was paid no override on business produced by Earl after the first of the year. He made no protest as to this non-payment and his conduct was such as was calculated to lead the other contracting party to believe that he acquiesced in its construction of the contract. It was only after Wear's connection with the company had ceased that he asserted his claim to an override on business produced by Earl from and after January 1, 1948.

From recitations appearing in the order granting judgment non obstante veredicto, it appears that the trial judge regarded the contract providing for written notice as being clear and unambiguous. With this view I do not agree. If we leave aside all consideration of the circumstance that the supplemental agreement (referred to by the Chief Justice as Contract No. 2) contained no provision within itself as to written notice of cancellation and consider that it is an integral part of the primary contract (referred to by the Chief Justice as Contract No. 1), the same as if the provisions thereof were simply additional paragraphs of the primary contract, an ambiguity nevertheless exists.

Paragraph X of the primary agreement, insofar as here pertinent, relating to written notice, reads as follows: "Except for such renewal rights as may be provided for, this agreement may be terminated by the Company or by the Agent on thirty days written notice to the last known mailing address. * * *"

This clause seems to apply to a termination of the entire agreement. Would it be applicable to the abrogation of certain specific clauses of the contract, so as to effect

rates would go into effect on January 1, 1948? A Yes.

"Q If the supplemental agreement had not been terminated in October, 1947, if you had not considered that the supplemental agreement was terminated in October, 1947, would you have made this new agreement with Mr. Earl? A No, I would have checked the figures. There are certain laws as to how much commissions that we can pay. If we had raised Mr. Earl and also paid Mr. Wear, I feel sure that some of the commissions paid would have been in violation of the law."

Wear's testimony differs in some detail from that of Hennessey, but he stated that he knew in the fall of 1947 that Hennessey wanted to raise Earl's commissions. He testified that:

"Mr. Earl's agency continued to grow, he was very successful, he produced a lot of business and he wanted more commissions. He thought he deserved them. He probably did, but according to law (probably referring to Article 4807, Vernon's Ann.Civ.Stats., now Article 11.08 of the 1951 Insurance Code) the only way a mutual company could increase the commission would be to take them away from me, so this conversation came up with Mr. Hennessey, he wanted to increase Mr. Earl's commission so he wouldn't quit, and I didn't want to give up my commissions. * * * He wanted to reduce mine so as to give it to C. H. Earl. * * * Mr. Earl was demanding and requesting that his commissions be increased and the only way they could be increased was to decrease mine."

a partial cancellation only? In my opinion, it would not be unreasonable to take the position that the clause relating to written notice applied only to complete and total termination of the agreement. This view has support in the wording of the clause, and even if the same be incorrect, as a matter of legal construction, this does not mean that the provision is free from uncertainty and ambiguity. This proposition is settled by the cited case of Humble Oil & Refining Co. v. Harrison, 146 Tex. 216, 205 S.W.2d 355.

Ordinarily, when a contract is ambiguous, resort may be had to parol evidence and the conduct of the parties thereunder becomes important. While here we have no mutually adopted construction of a contract of doubtful meaning, we do have the adoption of a reasonable construction of a contract by one of the parties, and a seeming acquiescence in such construction by the other party over a comparatively long period of time. The unilateral construction, if it be so called, did not relate to a provision which was of the essence of the contract, or which constituted a dominant clause thereof. No term was fixed by the contract. It was cancellable by either party. The point involved here relates to a confused and uncertain provision as to the means whereby the abrogation of certain clauses of a contract might be accomplished and the contract in part cancelled. Under such conditions equity will afford relief by way of estoppel. The doctrine is admittedly narrow and the case of Lohmann v. Hooper, Tex.Civ.App., 87 S.W.2d 803, involving unambiguous contractual clauses need not be relied upon, for the facts of this case bring it well within the equitable doctrine announced in Humble Oil & Refining Company v. Harrison, 146 Tex. 216, 205 S.W. 2d 355. Harrison, after seeming acquiescence was not allowed to take advantage of Humble's misconstruction of an ambiguous written instrument. It follows that Wear should not be allowed to take advantage of Hennessey's misconstruction of an ambiguous written instrument in view of his seeming acquiescence. The cited case is controlling and on the basis of that authority I concur in the result reached by the Chief Justice as to the termination date of Wear's override. I further concur in his holding upon the question of attorney's fees and agree that judgment in this case should be rendered as indicated in his opinion.

POPE, Justice (dissenting).

The court is in agreement for the most part on the result reached in this cause, all being of the opinion that Wear is not entitled to recover commissions based on Earl's sub-agents, but I do not agree that Wear should not recover commissions based on Earl's personal production for the period between January 1, 1948, and June 28, 1948. To that extent I dissent.

This case presents five main questions: (1) Were the Wear original agreement and his "supplemental agreement" an entire single contract, or separate contracts? (2) What is the meaning of Wear's complete contract, particularly with regard to his right to commissions on Earl's sub-agents? (3) Was Wear's contract ever changed by agreement of the parties? (4) Did Wear waive his right to insist upon written notice? and (5) Was he estopped from claiming his right to written notice?

On July 1, 1946, the insurance company entered into a written contract with Wear. At the same time the insurance company also entered into a written contract with Earl. On that same day, the insurance company made a second agreement with Wear, which enlarged upon and added to his compensation by allowing him commissions in addition to those allowed by the other instrument already executed by Wear and the company. This second Wear instrument was executed on the same day and it additionally obligated the insurance company to pay Wear certain commissions "on life insurance contracts issued by said company on insurance written by C. H. Earl under his contract dated July 1, 1946." That additional document was physically attached to the former Wear contract. At the top of the second contract were typed the words, "Supplemental Agreement."

Whether the original Wear agreement and the "Supplemental Agreement" are a part of the same contract becomes impor-

tant in the determination of the time the Wear contract was terminated. The insurance company claimed an oral termination given in the fall of 1947 to be effective on January 1, 1948. Wear contends that his contract could not be terminated until written notice was given him, as required by the first document which permitted termination only "on thirty days written notice." Written notice was not mailed Wear until May 28, 1948. Since the written notice would be effective about six months later than the claimed oral notice, it affects the judgment by several thousand dollars, and that period is actually the only difference between the result reached by the majority of this Court and this opinion.

The insurance company contends that the original Wear contract and the supplemental agreement are separate and distinct contracts. The trial court concluded that they constituted a single entire agreement, and I concur in that view. The contracts were tied to each other in point of time, subject matter, and by terms of reference in each document. They were attached to each other. The original contract provided: "This agreement, together with any amendments thereto duly executed, constitute the entire contract between the parties * * *." That document looked forward to possible amendments and it was agreed and contracted that those amendments would be considered a part of the original contract and a single agreement. Moreover, the other Wear instrument, executed the same day, was entitled a "Supplemental Agreement." Except for the original Wear agreement, what else could it or did it supplement? It did not stand alone in isolation, but the parties at the outset announced to each other by the title mutually selected by them, that it was to complete, add to, and aid something that had gone before. It was not in conflict with any provisions of the prior Wear contract, but was a completion of the contract. Surely there was no reason for or need to reiterate all of the provisions of the prior agreement after the parties had already agreed that they were an entire contract. The very absence in the second Wear agreement of clauses which had already been adequately settled upon between the same parties a short time before, evidences their understanding that the two agreements were one. To hold that the two documents were not parts of the same thing, requires us to disregard the first thing and the first word the parties decided should be put down upon their written agreement to guide them—the word "supplement." I do not think the word can be held meaningless. The parties chose it, and whatever we might think about it, they selected it to mean something. The name of a document selected by the parties does not control over an idea otherwise manifested, but when their designation is an exactly correct one, I know no reason that it should be ignored, and surely words symbolize the ideas of the persons using them.

The "supplemental agreement" completed that which was incomplete. The insurance company, for reasons of its own, did not want Earl to know that Wear was making money on Earl's services; but as between Wear and the insurance company the first agreement stated only a part of Wear's true compensation for serving the company. It never did fully state the full Wear agreement for compensation. The two documents together were the complete statement of his compensation, but separately they were both incomplete. The two documents are necessarily read together to find out what Wear was to earn with the company. At the time the first Wear contract was signed it still was an incomplete statement of the compensation agreement of the parties. Only after the supplemental agreement was signed did the parties conclude their understanding as to the full measure of Wear's compensation. The first contract standing alone at all times was an incomplete statement of the parties' agreement. Together they constitute the complete and single agreement for compensation and a single transaction. Execution of the supplement was the final act that consummated a full agreement and a complete statement of a bargain that was nonexistent until its execution. Rudes v. Field, 146 Tex. 133, 204 S.W.2d 5; Veal v. Thom-

ason, 138 Tex. 341, 159 S.W.2d 472; Wood Motor Co., Inc., v. Hawkins, Tex.Civ.App., 226 S.W.2d 487; Carpenter v. Southern Properties, Tex.Civ.App., 299 S.W. 440; Texas Co. v. Waggoner, Tex.Civ.App., 239 S.W. 354; Chicago Life Ins. Co. v. Tiernan, 8 Cir., 263 F. 325.

The inquiry here is not whether several documents should be construed together to clarify ambiguities. Cowden v. Broderick & Calvert, 131 Tex. 434, 114 S.W.2d 1166, 1170, 117 A.L.R. 61. The true inquiry here is: What was the full and complete agreement between the parties? When that question is answered, there is no ambiguity. When it is answered we simply follow the express terms of the full contract instead of its fragments. This is not an instance of taking bodily certain terms of one contract and placing them in another separate contract. I recognize that separate contracts may explain each other, and yet their provisions may not be juggled about between them. Mechanics' Lumber Co. v. Yates American Mach. Co., 181 Ark. 415, 26 S.W.2d 80. That is the correct holding of such cases as Huylers v. Ritz-Carlton Restaurant & Hotel Co. of Atlantic City, D.C., 1 F.2d 491, 492, relied upon by appellant and cited in the opinion of the Chief Justice. In the Huylers case, quite properly, it was held that a simple contract and a sealed agreement could not be considered a single complete contract. The court there recognized that separate instruments could be construed together to determine intent even though they were not considered a single contract. The court, in speaking of this rule of construction, said: "It does not convert a specialty into a simple contract, or a simple contract into a specialty." The rule permitting the construction together of separate instruments simultaneously executed is one rule, but the rule treating more than one document as parts of an entire and complete contract is another rule. In the case of separate and different contracts, clauses in one document are not bodily taken from one document and transposed into another. But if the contract is entire, the clauses are all a part of that entire contract. Whereas the Huylers case was a holding that a specialty and a simple contract could not by reason, among other things, of their formal nature, be a single contract, this is a case of a single entire contract—not separate contracts. Once it is determined that the two documents are in reality one document, the clauses of one, not only may be construed with the other, they are a part of each other. This has been previously decided by this court. Volunteer State Life Ins. Co. v. Snipes, Tex.Civ.App., 209 S.W. 2d 935; accord, Haddad v. Tyler Production Credit Ass'n, Tex.Civ.App., 212 S.W. 2d 1006; Guadalupe-Blanco River Authority v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989, 996; Frankfurt Finance Co. v. Treadaway, Tex.Civ.App., 159 S.W. 2d 514; Empire Gas & Fuel Co. v. Stern, 8 Cir., 15 F.2d 323.

I think these documents formed a single complete contract for the reasons stated in United States v. Bethlehem Steel Corporation, 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855, where thirteen shipbuilding contracts were involved. On February 1, 1918, seven contracts were executed for the construction of ships, tankers and tugs, but during March, April and May six other contracts were executed. Under the contracts Bethlehem Steel was to receive a bonus for effecting certain savings, and it was held in the Circuit Court that the bonus for savings formed part of the consideration for Bethlehem's obligation to build the ships. U. S. v. Bethlehem Steel Corp., 3 Cir., 113 F.2d 301. The Supreme Court, in affirming the case, said: "Whether a number of promises constitute one contract or more than one is to be determined by inquiring 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.' Williston on Contracts, Rev.Ed. § 863, and cases there cited. The record makes it clear that each of the contracts here was assented to as a single whole, and that consummation of a bargain between the parties depended upon inclusion of the half-savings clause." [315 U.S. 289, 62 S.Ct. 587.]

For these reasons, Wear's complete contract provided that the consideration for his serving the company would consist of com-

missions on his own production and the additional compensation given by the supplemental contract.

Did Wear's contract entitle him to compensation also on business produced by Earl's sub-agents? I think not, and on this result all members of the court are in accord, but for different reasons. The parties in integrating their understanding prepared and signed three documents. Wear's original agreement expressly provided that he could employ sub-agents. On the same date, and on exactly the same kind of printed form, Earl made his agreement with the same insurance company, and Wear's "supplemental agreement" referred to it in aid of his agreement for compensations. The supplemental agreement stated that Wear would receive an override on "insurance written by C. H. Earl under his contract dated July 1st, 1946." Earl's contract, unlike Wear's contract, did not contain a clause authorizing Earl to employ sub-agents. Wear had three documents before him when he executed his agreement controlling his compensation. Wear's contract gave him the right to employ sub-agents, and Earl's contract executed at the same time did not give Earl that same right. The parties undertook to define their rights as regards sub-agents. Wear required it in his own contract, but he did not require it in Earl's, though he knew that his compensation was in part measured by Earl's contract. The parties were contracting with an eye toward sub-agents. After the parties did undertake to contract about sub-agents, Wear will not be heard to say that he would have had the right in any event. He may have had such a right by the general custom of the business, but general custom becomes immaterial when the parties define their rights by contract as regards those matters of custom.

Evidence was presented showing abundantly that over a period of twenty-three months the insurance company actually did pay Wear an override on the business produced not only by Earl personally but also on that produced by several other sub-agents, or persons who were selected and trained by Earl. The company also sent monthly cards or notices to Wear advising him of the business produced by those other persons. This evidence is used to show that the contract was practically construed to mean that Wear should receive an override not only on Earl but on Earl's sub-agents too.

I would agree with this except for the dominant fact that Wear did not make such a contract. His contract is clear on its face. Custom and the practical construction by the parties may be controlling evidence where there is an ambiguity in the contract. Instead of explaining an ambiguity, however, it is used in this case to raise the ambiguity. "The practical construction put on a contract by the parties cannot control or vary the express unambiguous provisions of the instrument itself and the legal effect thereof; it cannot prevail where it contradicts the clear meaning of plain terms; and the fact that the parties have placed an erroneous construction on an unambiguous contract will not prevent the court from giving the true construction to the contract." 17 C.J.S., Contracts, § 325, pp. 760, 761; Richardson v. Hart, 143 Tex. 392, 185 S.W.2d 563; Shropshire v. Commerce Farm Credit Co., 120 Tex. 400, 39 S.W.2d 11, 39 S.W.2d 282, 84 A.L.R. 1269; Highlands Farms Corporation v. Fidelity Trust Co., 125 Tex. 474, 82 S.W.2d 627; Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504; Parrott v. Brotherhood of Railroad Trainmen, Tex.Civ.App., 85 S.W.2d 306.

On the matter of Wear's right to recover commissions on Earl's sub-agents, Wear finds himself in the position of claiming by his contract commissions on sub-agents that Earl could not under the contract employ. He would have us imply the power to employ agents, though the contract was express as to him and silent as to Earl; and then he would have us imply that he would recover commissions on those employed, though the contract was express as to "insurance written by C. H. Earl," and silent as to anybody else.

When we place these three documents side by side in front of us, knowing that Wear's contract consisted of his own agreement and its supplement, and that the supplement referred to Earl's contract, we have

before us clear answers to all of the questions in this case. There is no need to go beyond those three documents, and there is no ambiguity in their meaning.

Did the parties ever modify Wear's contract of July 1, 1946? The jury said that there was never any agreement to cancel the contract. It is undisputed that Wear continued on with his work with the company until he received the written notice of cancellation and that this was with the knowledge and consent of the insurance company. If, during that time, Wear was working for less compensation than his entire contract awarded him, where is that new contract and when was that modified contract agreed upon? Out of the controversy raging about cancellation of a contract, some way or another, a new contract mysteriously comes into being. Actually the position of the insurance company is not that the Wear contract was orally cancelled before January 1, 1948, but that it was changed and modified so that he would receive less compensation, but keep on working. The new arrangement would give Wear compensation for his own business produced, but not commissions on Earl's production.

The insurance company advances the argument that Wear's supplemental agreement by referring to the Earl contract of July 1, 1946, gave Wear compensation on Earl's production. It argues that the company changed Earl's contract of July 1, 1946, that there was no longer any basis for the Wear contract, and that it was changed to that extent. Earl never ceased to work and produce but after January 1, 1948, he had a different contract with the company, though it was not actually reduced to writing until some five months later. This argument means that the insurance company by changing its contract with Earl, upon which the Wear contract depended, also worked a corresponding change in the Wear contract, whether Wear agreed to the change or not.

Wear's rights were controlled by his own contractual relations with the insurance company. His contract provided for its complete elimination on thirty days' written notice. If Wear's complete compensation was ever reduced for the period between January 1, 1948, and June 28, 1948, it was by some method other than his own agreement, the terms of his express written agreement, and not by reason of cancellation by the terms of his contract.

While the insurance company was not required to keep its original Earl contract in existence, insofar as Wear's rights depended upon it, Wear's contract required the company to give Wear written notice of a change which would cancel out his rights. This is not an instance where the contract of July 1, 1946, expired by its terms, as in the royalty cases cited in the opinion of the Chief Justice; it is a case where the insurance company has by its affirmative acts shortened the agreement by destroying a part of the subject matter. So long as Earl's contract was the subject matter of Wear's contract, it could not be terminated insofar as he was concerned until he was given thirty days' written notice, or by a mutual agreement, if they wanted to modify Wear's contract. I do not think that one who voluntarily destroys the yardstick by which he has covenanted to measure the rights of another can be heard to say that such conduct wipes out that other's rights. Zachry v. Robertson, 147 Tex. 307, 214 S.W.2d 949; Dodds & Wedegartner v. Reed, Tex.Civ.App., 69 S.W.2d 165; Miller v. Hodges, Tex.Com.App., 260 S.W. 168, 172; City of Kirbyville v. Smith, 104 S.W.2d 564; Bueche v. Eickenroht, Tex. Civ.App., 220 S.W.2d 911; Business Men's Assur. Co. of America v. Eades, 290 Ky. 553, 161 S.W.2d 920.

Did Wear waive his right to have thirty days' written notice? There is nothing abstruse about the provision in the Wear contract stating that Wear's contract could be cancelled on thirty days' written notice. It was executed by an insurance executive who, from the evidence, had executed many other contracts containing the same provision. The insurance company handled all of its agents and representatives by written rather than oral contracts, and this provision was in all of them. Wear relied upon the plain and simple terms of his contract, and the insurance company did not. The insurance company took the position that

Wear should have coached the insurance representative about the company's contractual rights that had only to be read to be understood. Wear simply remained silent at a time where there was no duty to speak. The insurance company, in effect, told Wear that some time in the future a change would be made, and the insurance company says that under those circumstances it is the duty of the employee to announce his future plans. In this case, the contention is that Wear should have told the insurance executive that his rights were controlled by a written contract, a thing which certainly he already knew. The executive did not read the documents—just the supplement. Barron G. Collier, Inc., v. Davidson-Levine, Inc., Tex.Civ.App., 294 S.W. 223, 224, in holding that there was no waiver of a contractual provision for written cancellation notice, said: "This evidence constituted neither a waiver of the written contract nor a cancellation of the contract. The parties had directed by contract the precise manner in which the contract could be canceled. * * * At most this testimony can only be considered as a warning that appellant could expect within the 90 days' time written notice from appellee that it would exercise its right of cancellation." I find no circumstances which required Wear to speak up; he could, as he did, rely on his contract which embodied the full understanding between himself and the company. East Texas Fire Insurance Co. v. Perkey, 89 Tex. 604, 35 S.W. 1050; Sammons v. Hodges, Tex.Civ.App., 95 S.W.2d 734; Miller v. Deahl, Tex.Civ.App., 239 S.W. 679; Texas Life Insurance Co. v. Huntsman, Tex.Civ.App., 193 S.W. 455; Lucas Hunt Village Co. v. Klein, 358 Mo. 1054, 218 S.W.2d 595; Clark v. Dye, 158 Minn. 217, 197 N.W. 209, 212; Wiser v. Lawler, 189 U.S. 260, 23 S.Ct. 624, 47 L.Ed. 802, 809; Allenbaugh v. City of Canton, 137 Ohio St. 128, 28 N.E.2d 354.

The final matter is whether Wear is estopped to claim his contractual right to a written notice. The jury found that Wear was estopped, inasmuch as he learned in October about the company's plan of a change and said nothing, but stood by while the company changed its position by increasing commission rates to Earl and other agents, in reliance upon Wear's silence and failure to speak up. The earliest that the evidence shows Wear was advised orally of a change in his status was during October, 1947. Any conduct on his part which could give rise to an estoppel necessarily would occur after that date. But a letter in evidence from the company to Earl, dated in September, 1947, shows that Earl and the company had already reached their agreement about the increased commission. The September letter explained to Earl that he would get no commission on one of his new sub-agents to whom Earl had given a 70% commission, that being all that Earl could get, and it went on to say: "At the present time this means that you will receive no overwrite. Of course, on all policies effective on or after January 1, 1948, you will receive 5% overwrite and 2½% renewal." When confronted with this record testimony, I ask the same question asked by the trial court in explanation of his action disregarding the jury findings on estoppel: "How could the conduct of Wear subsequent to October, 1947, have lead defendant company into an injurious position by making the agreement with Earl, when the company had already made the agreement with Earl in October, 1947?"

I conclude that the original Wear contract and its supplement are a single complete contract; that it, together with Earl's contract, which is referred to by the supplement, should all be construed together. When this is done there are no ambiguities and the contract required that written notice be given Wear to effect a cancellation. This was not given until May 28, 1948, which terminated the contract on June 28, 1948, up to which time Wear is entitled to recover under his complete contract. There was never any agreement to modify or cancel Wear's contract. Construing the plain words of all the three documents together, Wear should recover insurance written by Earl, but not by his sub-agents. Wear did not waive and under the evidence could not be estopped from insisting upon the contractual written notice. I would allow Wear his commission on Earl's individual production up to June 28, 1948.

I would reform the judgment and award Wear a judgment for $4,703.28, together with attorney's fees and interest, and award him commissions on those renewals allowed by the majority but would allow them up to June 28, 1948, instead of January 1, 1948.